**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Bobby G. SEALE, Defendant-Appellant.**

**No. 18246.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1972.

Decided May 11, 1972.

Leave to File Petition for Rehearing Denied July 6, 1972.

Elizabeth B. DuBois, Eric Schnapper, Jack Greenberg, Michael Meltsner, New York City, Marshall Patner, Thomas R. Meites, Chicago, Ill., Anthony G. Amsterdam, Stanford, Cal., Charles R. Garry, Benjamin Dreyfus, Francis J. McTernan, San Francisco, Cal., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary Starkman, Jeffrey Cole, James Breen, Royal Martin, Jr., Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, CUMMINGS and PELL, Circuit Judges.

CUMMINGS, Circuit Judge.

Defendant Seale and seven other persons were indicted for violating the Federal Anti-riot Statute and for conspiracy to violate it (18 U.S.C. §§ 2101 and 371).* When Seale and his co-defendants were arraigned on April 9, 1969, Charles R. Garry of the California Bar informed the district judge that he would represent Seale and defendants Hoffman, Weiner, and Froines at the trial. September 24, 1969, was fixed as the trial date.

At pretrial proceedings on August 27, 1969, co-counsel William Kunstler advised the judge that the defendants would be represented "by a trial team," and that Mr. Garry was chief counsel and "essentially will be representing [Seale] assuming that he [Garry] gets back in time from [a] gall bladder operation." A continuance of the trial date, requested on the grounds of pretrial publicity and conflicting litigation schedules of counselors Kunstler and Garry, was denied.

On September 9, 1969, Garry requested a postponement of the trial date until November 15 because of the necessity of his undergoing a gall bladder operation at the conclusion of a California trial in which he was then engaged. This postponement was also denied. The court noted that Messrs. Michael Tigar, Irving Birnbaum, and Stanley Bass had also entered appearances for Seale, and therefore concluded that it was unnecessary to give Seale an opportunity to secure other counsel in place of Garry. In response to the complaint that these attorneys were engaged solely for special pretrial work or were only local counsel and were never intended to function as trial counsel, the trial judge stated there was no such thing as a limited appearance in a criminal case.[1]

At the commencement of the trial proceedings, Mr. Kunstler filed a writ-

* Whereas this appeal concerns Seale's alleged acts of contempt, the companion case, In the Matter of David Dellinger et al., No. 18294, 461 F.2d 389, also being released today, deals with alleged contempts of his co-defendants and of two trial counsel. Finally, the substantive Anti-riot Act case will be disposed of in a later opinion in United States v. Dellinger et al., No. 18295.

1. Criminal Rule 2.01 of the court below provides:
"FILING APPEARANCES OF ATTORNEYS
"An attorney representing a defendant in any criminal proceeding pend-

ten appearance on behalf of Seale[2] and three other defendants. He qualified his statement of representation to the court by saying that all defendants took the position they were not fully represented in Mr. Garry's absence and asked that each defendant be permitted to make a statement to that effect. The court disallowed the request. Co-counsel, Mr. Weinglass, informed the court that Seale was in fact without counsel but, relying on the appearances filed in Seale's behalf, the court stated that was not a fact and refused to hear argument on that point. When Seale was introduced to the group of prospective jurors, the court informed them that Seale was represented by Messrs. Garry, Tigar, Birnbaum, and Bass. Asked if there was additional counsel for Seale, Mr. Kunstler stated he had filed an appearance, and the court included Mr. Kunstler in the list of Seale's counsel.

On September 26, after the jury had been impanelled but prior to hearing the evidence, the court denied Seale's motion requesting a continuance until Garry could be present to represent him and requesting dismissal of his attorneys of record in the event no continuance was allowed. On the same day, after the opening statements of defense counsel, Seale unsuccessfully attempted to make his own opening statement, and Kunstler refused to make an opening statement on Seale's behalf on the ground that Kunstler was not Seale's attorney. The court announced:

"If any defendant here has any rights which he perceives to have been violated by going ahead with this trial with lawyers that have appearances on file, without the attendance of Mr. Garry, their rights are there."

Thereafter the trial judge relied completely on Kunstler's written appearance as counsel for Seale as being dispositive of Seale's claim he was not represented and of Kunstler's protestations that he did not in fact represent Seale. On this basis the court refused to permit Seale to represent himself. Accordingy, Seale's October 20 *pro se* motion to represent himself was denied, as was Kunstler's October 22 motion to withdraw as counsel for Seale.

On subsequent occasions Seale vehemently complained that his Sixth Amendment right to counsel of his choice and his right to represent himself were being denied. Several times Seale attempted to represent himself. He was bound and gagged on the afternoon of October 29 in an effort to maintain courtroom decorum. This was a measure deemed permissible in Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353. However, his restraints were removed on November 3.

On November 5, after six weeks of trial, the court *sua sponte* declared a mistrial as to Seale, and his trial was severed from that of his co-defendants.[3] Acting under Rule 42(a) of the Federal Rules of Criminal Procedure, the court simultaneously adjudged Seale guilty of sixteen acts of contempt, resulting in a sentence of three-month terms apiece,

---

ing in this Court or before the United States Commissioner or Magistrate shall file an appearance. This appearance must be filed prior to or simultaneously with the filing of any motion, brief or other document with the Court, or initial Court appearance, whichever occurs first. A copy of the appearance shall be served on the United States Attorney.

"The filing of an appearance with the United States Commissioner or Magistrate does not relieve an attorney from filing an additional appearance with the Court if and when the case is brought before the Court, and again serving a copy on the United States Attorney.

"The appearance shall include the attorney's name, local address, city, (including zip code), and local telephone number."

2. Two days earlier, on September 22, 1969, Kunstler had filed an appearance "*pro tem,*" assertedly to gain access to the incarcerated Seale.

3. The Government eventually dismissed its case against Seale.

or a total of four years' imprisonment.[4] Seale claims that nearly all sixteen acts arose out of his objections to Garry's absence and his attempts to represent himself at the trial.

In the certificate of contempt, the trial judge found that each of the 16 specified acts of contempt

> "constituted a deliberate and wilful attack upon the administration of justice in an attempt to sabotage the functioning of the Federal judicial system; that the misconduct was of so grave a character as to continually disrupt the orderly administration of justice."

The legal standards relating to the acts of contempt charged will be discussed later in this opinion.

### Contempt Trial Before Another Judge

In Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532, Mayberry's *pro se* defense to criminal charges was marked by brazenly contemptuous conduct, including an insolent, personal attack on the trial judge. The judge did not act instantly, but waited until the conclusion of Mayberry's trial to cite him for contempt. The Supreme Court reversed and remanded for a contempt hearing before another judge, holding that where the trial judge is the object of personal vilification carrying potential for bias and he does not act instantly to cite for contempt, he may not, as a matter of due process, sit in judgment on the alleged contemnor. Rather, the defendant is entitled to a hearing before a judge other than the one he has reviled.

The Government concedes that the aspersions cast upon the trial judge by Seale were of the same character as Mayberry's.[5] Our review of the record finds the concession well taken. However, the Government seeks to avoid *Mayberry's* disqualification requirement on the ground that the trial judge was justified in personally citing Seale as an emergency measure to prevent a complete breakdown of the trial and to salvage the proceedings against the remaining defendants. We cannot agree.

The mistrial and severance of Seale were the emergency measures taken to insure a fair and orderly trial of the other defendants. Seale was cited for his past conduct as a finale just before he was released from the courtroom. It is argued that this was necessary for its deterrent effect on the remaining defendants who had already indicated their propensity toward misbehavior. At least in the absence of personal embroilment (a matter which we do not reach), the trial judge could have cited Seale for contempt instantly even though he was personally attacked. *Mayberry, supra* at 463, 91 S.Ct. 499; see Johnson v. Mississippi, 403 U.S. 212, 214, 91 S.Ct. 1778, 29 L.Ed.2d 423; Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed. 2d 353. The need for order in the courtroom to be achieved through the deterrent effect of an immediate citation of the contemnor is thought to override the possibility of bias on the part of the trial judge. See United States v. Meyer, 149

---

4. At the time of trial, the judge was bound by our ruling in United States ex rel. Allen v. Illinois, 413 F.2d 232 (7th Cir. 1969; Judge Hastings dissenting), reversed, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353, which disallowed removal of an unruly defendant as a means of preserving order in the courtroom.

5. The Government has also conceded that the conduct of the non-lawyer contempt defendants in In the Matter of David Dellinger et al., No. 18294, is within the ambit of *Mayberry*, and as to those defendants has moved for a vacation of the contempt convictions and a remand for a hearing before another judge. The Government challenges the applicability of *Mayberry* (or Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L. Ed. 11) to the lawyer defendants, contending the trial judge was not disqualified from holding them in contempt at the conclusion of the trial under Sacher v. United States, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717. See In the Matter of David Dellinger et al., No. 18294.

U.S.App.D.C. ——, 462 F.2d 827 (1972).[6] However, the deterrent effect on the remaining defendants is speculative by comparison.

■ We have no doubt that the able trial judge would have asked another judge to preside at Seale's contempt hearing if *Mayberry* had been handed down before the contempt citation date.[7] More importantly, there is nothing to indicate that summarily finding Seale in contempt upon declaration of the mistrial would be a more effective deterrent to misconduct by the other defendants than simply bringing home to them the fact that their former co-defendant had been charged with contempt and was bound over for a later hearing under Rule 42(b) of the Federal Rules of Criminal Procedure. Any generalized deterrent effect on the remaining defendants is simply too tenuous and improbable a ground to overbalance the inherent possibility of prejudice to Seale in the trial judge's acting himself.[8] "The normal constitutional presumption in favor of a due process hearing is therefore controlling." United States v. Meyer, *supra* at ——, 842. Consequently, we hold that *Mayberry* directly controls this case and makes it incumbent upon a different judge to preside at Seale's contempt hearing on remand.

*Jury Trial*

■■ In Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522, the Supreme Court held that the Sixth Amendment right to trial by jury applies to serious criminal contempts. In the case of criminal contempts, as with other crimes, the relevant criterion of seriousness is the penalty involved. Id. at 198, 211, 88 S.Ct. at 1487; Cheff v. Schnackenberg, 384 U.S. 373, 380, 86 S.Ct. 1523, 16 L.Ed.2d 629. Ordinarily the statutorily authorized maximum penalty is determinative (Baldwin v. New York, 399 U.S. 66, 72–74, 90 S.Ct. 1886, 26 L.Ed.2d 437), but since Congress has not expressed a judgment as to the seriousness of a criminal contempt by prescribing a maximum sanction in 18 U.S. C. § 401, we are to look to the penalty actually imposed. Frank v. United States, 395 U.S. 147, 148–150, 89 S.Ct. 1503, 23 L.Ed.2d 162; Bloom v. Illinois, *supra*, 391 U.S. at 211, 88 S.Ct. 1477; Cheff v. Schnackenberg, *supra*, 384 U.S. at 380, 86 S.Ct. 1523. If the penalty actually imposed exceeds six months' imprisonment, the maximum sentence for a "petty offense" under 18 U.S.C. § 1, the contempt is serious, and a jury trial must be afforded. Frank v. United States, *supra*, 395 U.S. at 151, 89 S.Ct. 1503; see Cheff v. Schnackenberg, 384 U.S. *supra* at 379–380, 86 S.Ct. 1523.

Under Rule 42(a) of the Federal Rules of Criminal Procedure, Seale was summarily sentenced to three months for each of 16 acts of misbehavior made punishable by 18 U.S.C. § 401(1),[9] the sentences to be served consecutively. Seale contends that in assessing the penalty actually imposed in order to determine whether he is entitled to a trial by jury, we must look to the aggregate sentence of four years and not to each three-month sentence separately. The Government generally spurns the aggregation approach in determining entitlement to jury trial and further argues that Seale's allegedly contemptuous conduct was a

6. Justice Black apparently disagreed with even this resolution of the competing policies. *Mayberry, supra* 400 U.S. at 466, 91 S.Ct. 499. See The Supreme Court, 1970 Term, 85 Harv.L.Rev. 1, 300–301 (1971).

7. In the related contempt appeal involving *Dellinger* et al., No. 18294, the Government does not challenge the retroactivity of *Mayberry* because "justice must satisfy the appearance of justice" (400 U.S. at 465, 91 S.Ct. at 505).

8. See Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 283 (1971).

9. 18 U.S.C. § 401 provides in pertinent part:
 "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
 "(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice."

series of unrelated, independent outbursts which should not be lumped together.

The issue, one of first impression in the federal courts, is fraught with difficulty, but we resolve it in favor of the appellant.

In *Bloom*, Mr. Justice White, writing for the Court, emphasized the peculiar susceptibility of the criminal contempt power to abuse in the hands of judges. 391 U.S. at 202–207, 88 S.Ct. 1477. It is for this reason that "despite the important values which the contempt power protects, courts and legislatures have gradually eroded the power of judges to try contempts of their own authority." 391 U.S. at 207, 88 S.Ct. at 1485. Accordingly, the federal courts have long and consistently articulated the importance of limiting the scope of judges' authority to punish under the contempt statute in derogation of regular due process procedure. In In re Michael, 326 U.S. 224, 227, 66 S.Ct. 78, 79, 90 L.Ed. 30, the Supreme Court found "a Congressional intent to safeguard constitutional procedures by limiting courts, as Congress is limited in contempt cases, to 'the least possible power adequate to the end proposed.'" See Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (legislative contempt); In re McConnell, 370 U.S. 230, 236, 82 S.Ct. 1288, 8 L.Ed.2d 434; United States ex rel. Robson v. Malone, 412 F.2d 848, 850 (7th Cir. 1969). While acknowledging a court's broad discretion to vindicate its own authority in Gompers v. Buck's Stove and Range Co., 221 U.S. 418, 451, 31 S.Ct. 492, 502, 55 L.Ed. 797, the Court cautioned:

"But the very amplitude of the power is a warning to use it with discretion, and a command never to exert it where it is not necessary or proper."

In In re Gitkin, 164 F. 71, 74 (E.D.Pa. 1908), the Court noted that

"[t]he power of the courts to punish for contempt has always been looked on in this country with much jealousy, and a very strong disposition shown in all jurisdictions to restrain it. It has been declared to be arbitrary in its nature \* \* \*, and to be an exception to the provisions of the Constitution of the United States and not to be extended in the least degree beyond the limits imposed by statute."

Similarly, it is because of the power's amenability to subtle, undetectable misuse that "in contempt cases an even more compelling argument can be made for providing a right to jury trial as a protection against the arbitrary exercise of official power." Bloom v. Illinois, 391 U.S. 194, 202, 88 S.Ct. 1477, 1482, 20 L.Ed.2d 522.[10]

If a judge may wait until the termination of a trial to cite a contemnor with numerous specifications of contempt, penalizing each specified instance with a sentence of six months or less and thereby avoid impanelling a jury, the potential for abuse is obvious. Utilizing this procedure, any judge could review the record to single out "discrete" instances of contempt, impose up to six-month consecutive sentences for each instance and thereby imprison the contemnor for a theoretically unlimited term.[11] He would, in effect, have the power to decide whether the safeguard of a jury should be interposed wholly apart from the total punishment he metes out.

For example, the 16 specifications in the instant case are similar to those in United States v. Schiffer, 351 F.2d 91, 96–101 (6th Cir. 1965), certiorari denied, 384 U.S. 1003, 86 S.Ct. 1914, 16 L.Ed.2d 1017, where an attorney was cited for

---

10. The primary argument in favor of extending the right to jury trial to serious criminal contempts is that "in terms of those considerations which make the right to jury trial fundamental in criminal cases, there is no substantial difference between serious contempts and other serious crimes." 391 U.S. at 202, 88 S.Ct. at 1482.

11. See Comment, Invoking Summary Criminal Contempt Procedures—Use or Abuse? United States v. Dellinger—The "Chicago Seven" Contempts, 69 Mich.L. Rev. 1549, 1560 (1971).

contemptuous misconduct during the trial. "The contempt certificate set forth under four headings divided into sixteen parts the acts, statements and conduct of Schiffer during the six and one-half weeks' trial of the Hoffa case [United States v. Hoffa, 235 F.Supp. 611 (D.C.)] * * *." *Id.* at 93. Because the judge felt only one who witnessed the entire trial could fully appreciate the extent of misconduct, he made the entire record a part of the contempt proceeding, as the trial judge did here. The court then sentenced the contemnor to sixty-days' imprisonment and a fine which was later retracted. The presentation of the facts in *Schiffer* indicates that the judge dealt with the continual trial misconduct as a unitary offense. In such a case the judge is limited to a six-month sentence unless he wishes to impanel a jury. Yet another judge who looks at the same 16 parts as separate offenses could impose a sentence of 96 months, or eight years, without affording the contemnor a jury trial. This procedure could all too easily be employed to circumvent the holding of *Bloom*.

It is true, of course, that appellate courts could review the trial court's determination of discreteness. Cf. Yates v. United States, 355 U.S. 66, 72–74, 78 S.Ct. 128, 2 L.Ed.2d 95. (refusal of witness to answer 11 similar questions). The difficulty is, however, that the standards of such a review will be amorphous, and the result will be inconsistency of decision. There is hardly anything inev-

itable about whether disruptive activity occurring during the course of a single trial is viewed as a continuous course of conduct or as a series of isolated instances, and we are at a loss to devise a satisfactory test with which to make that judgment.[12] More important, appellate review of this determination does not afford the same measure of protection against arbitrariness as does a requirement that the total sentence imposed controls the right to a jury trial.

Even if the potential for abuse in the trial judge's post-trial "discreteness" determination is put to one side, there would still be too much opportunity facilely to circumvent *Bloom*. If in addition to several borderline instances of contempt, the contemnor were to engage in what the trial judge thought to be an outrageously contumacious act—one which standing alone would deserve punishment greatly in excess of six months —he could, by using the procedure employed below, "spread out" the just desserts for the egregious offense over the others, with the result that a serious offense would be severely punished without a jury trial. Indeed, in the instant case, the uniform three-month sentence for each specified act of contempt could leave the impression that no special attempt was made to make the penalty proportionate to the offense for which it was imposed.

Again the argument is made that appellate courts have the power to revise contempt sentences.[13] Certainly appel-

---

12. Cf. Patterson, Criminal Contempt: A Proposal for Reform Providing "The Least Possible Power Adequate to the End Proposed," 17 S.Dak.L.Rev. 41, 60–62 (1972).

 If we were pressed to pass judgment on this question, we would conclude that Seale's cited conduct was a continuous course of behavior rather than a series of unrelated acts. Of the 16 citations, only numbers 1, 3, part of 7, and 14 had nothing specifically to do with Seale's representation rights. That theme was a common feature of all the other citations. While a contemnor could artificially cloak his obstreperous actions with a common plaint so as self-servingly to create an

apparently unified offense, here the trial judge himself seemed to view the contemptuous instances as constituting parts of "a deliberate and wilful attack upon the administration of justice; an attempt to sabotage the functioning of the Federal Judicial System * * *" and "continually disrupt the orderly administration of justice."

13. See Cheff v. Schnackenburg, 384 U.S. 373, 380, 86 S.Ct. 1523, 16 L.Ed.2d 629; United States v. Bukowski, 435 F.2d 1094, 1110 (7th Cir. 1970), certiorari denied, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809; United States ex rel. Robson v. Malone, 412 F.2d 848, 850 (7th

late courts may reduce such excessive sentences, but they would hardly increase too lenient ones. Thus in the above example, reducing the sentences on overpenalized minor contempts would only serve to allow a grave offense to go underpunished. Furthermore, because a reviewing court "cannot have the same appreciation of an existing situation, from a review of a cold record, as does a presiding judge who witnesses the transgressions and senses the unfavorable impact upon the orderly administration of justice." [14] great reliance must be placed upon the discretion of the trial judge in meting out punishment.[15] In this posture appellate review cannot ensure as satisfactory a protection against the possibility of abuse illustrated above as measuring the right to jury trial by the cumulative sentence imposed for contempts occurring during a single trial.

■ Nevertheless, while the scope of the trial judge's authority under the contempt statute is to be strictly limited, it still must be adequate to the end proposed. Thus there is force in the Government's contention that if the right to a jury trial is based on the cumulative sentence imposed, a citation for contempt and imposition of a six-month sentence therefor early in the trial would exhaust the judge's summary contempt power and remove further exercise of that power from his arsenal of weapons with which to handle obstreperous defendants.[16] See Freund, Contempt at Court, 1 Human Rights 4, 6 (ABA Section of Individual Rights and

Responsibilities, 1970). On the other hand, where contemptuous conduct is cited and punished immediately upon its occurrence, the potential for abuse inherent in the post-trial proceedings is not so great. Consequently, where contemptuous conduct is cited and punished instantly, we think the punishment assessed for that conduct may be considered separately in determining the right to a jury trial. See Dobbs, Contempt of Court: A survey, 56 Cornell L.Rev. 183, 234 (1971).

■ Where, as here, the trial judge waits until a mistrial or the conclusion of court proceedings to cite for contempt, the argument stemming from the need to retain summary power to deal with future disruptions loses its force. It is contended that the appellant should not receive a jury trial because of the fortuity that all his contemptuous actions were cited in a single proceeding after his trial was over. However, the decision to save up the contempt specifications until the end of trial was deliberate, not fortuituos. Regardless, it is settled that a later citation for contempt may require more in the way of procedural protection than would have been necessary for instant action. Groppi v. Leslie, 404 U.S. 496, 504–506, 92 S.Ct. 582, 30 L.Ed.2d 632; Mayberry v. Pennsylvania, 400 U.S. 455, 463, 91 S.Ct. 499, 27 L.Ed.2d 532; Johnson v. Mississippi, 403 U.S. 212, 214, 91 S.Ct. 1778, 29 L.Ed. 2d 423; In re Oliver, 333 U.S. 257, 274–275, 68 S.Ct. 499, 92 L.Ed. 682; Ex parte Terry, 128 U.S. 289, 308, 310, 9 S.Ct.

Cir. 1969); Schnurman v. United States, 126 U.S.App.D.C. 315, 379 F.2d 92, 93 (1967).

14. Hallinan v. United States, 182 F.2d 880, 888 (9th Cir. 1950), certiorari denied, 341 U.S. 952, 71 S.Ct. 1010, 95 L. Ed. 1375; see also Fisher v. Pace, 336 U.S. 155, 161, 69 S.Ct. 425, 93 L.Ed. 569.

15. See Green v. United States, 356 U.S. 165, 182–183, 78 S.Ct. 632, 2 L.Ed.2d 672; United States v. United Mine Workers, 330 U.S. 258, 303, 67 S.Ct. 677, 91 L.Ed. 884; United States v. Galante, 298 F.2d 72, 75 (2d Cir. 1962);

Robles v. United States, 279 F.2d 401, 406 (9th Cir. 1960), certiorari denied, 365 U.S. 836, 81 S.Ct. 750, 5 L.Ed.2d 745; MacInnis v. United States, 191 F. 2d 157, 162 (9th Cir. 1951), certiorari denied, 342 U.S. 953, 72 S.Ct. 628, 96 L. Ed. 708; Hallinan v. United States, 182 F.2d 880, 887–888 (9th Cir. 1950), certiorari denied, 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 1375; United States v. Bollenbach, 125 F.2d 458, 460 (2d Cir. 1942).

16. See Illinois v. Allen, 397 U.S. 337, 343–344, 90 S.Ct. 1057, 25 L.Ed.2d 353.

77, 32 L.Ed. 405; United States v. Meyer, 149 U.S.App.D.C. ——, 462 F.2d 827 (1972).

We have identified the potential for abuse in the technique used below. But the Government has not shown that the protection afforded by an aggregation rule for determining the right to jury trial will debilitate the trial judge in the proper exercise of the contempt power. We perceive no sound rationale why requiring aggregation of contempt sentences in the post-trial situation would diminish the summary contempt power to a point where it is inadequate to the end proposed.

A jury trial of Seale's specifications will not diminish a court's power to punish for contempt but will merely pass the question of guilt to a jury. If the charges are supported by the evidence, a jury should not be detrimental to the court's power to vindicate its authority, since the jury will understand that a court cannot function without order and will review the facts and arguments accordingly. If the judge has been arbitrary, "identif[ied] offense to self with obstruction to law," [17] or has mistaken advocacy for misbehavior, tolerable inconvenience with obstruction, a jury can intervene. This function of harmonizing the power of the court with the public's view of how much judicial power it will tolerate creates an equilibrium that helps maintain the viability of the court as an institution. Whether or not the system is entirely successful, *Bloom* has already made "the choice in favor of jury trial" 391 U.S. at 209, 88 S.Ct. at 1486, 20 L.Ed.2d 522.

■■ The aggregation rule comports with the Supreme Court's insistence that the summary contempt power must be limited to "the least possible power adequate to the end proposed" (326 U.S. at 227, 66 S.Ct. at 79, 90 L.Ed. 30) and best effectuates the Court's ruling in *Bloom* that serious punishment for contempt may be imposed only after jury trial. We hold that where the judge waits to act until a mistrial or the end of a trial, consecutively imposed sentences for contemptuous conduct occurring during the course of the preceding trial must be cumulated to determine the defendant-contemnor's right to a jury trial.[18]

Although we conclude that these contempts must be aggregated in order to provide "a right to jury trial as a protection against the arbitrary exercise of official power" (391 U.S. at 202, 88 S.Ct. at 1482), the petit jury will still be free to pass on each of the legally sufficient specifications in determining Seale's guilt.[19] If the judge to whom this case is referred for trial decides that the outside limit of a sentence for Seale should be six months maximum including cumulation, that would obviate the necessity of having a jury on the remand.

### Necessity to Inquire of Seale Why He Objected to Counsel

During argument on the August 27, 1969, motion for a continuance, defense counsel Weinglass advised the district judge that Seale was represented only by Mr. Garry. Responding to the prosecutor's argument that Messrs. Tigar,

---

17. Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11.

18. We reject the contrary holding of Commonwealth v. Snyder, 443 Pa. 433, 275 A.2d 312 (1971) and the dictum in Weiss v. Superior Ct. of Pima County, 106 Ariz. 577, 480 P.2d 3 (1971). Further, while we do not express an opinion on the holding in New York v. Koscot Interplanetary, Inc., 330 N.Y.S.2d 492 (N.Y.Sup. Ct.1972), the case of an indirect contempt for violation of a court injunction, brought for hearing upon the motion of a party, is not necessarily susceptible to the same abuses and amenable to the same, less potentially prejudicial, immediate action alternative which have led us to adopt a qualified aggregation rule for direct contempts occurring during the course of a single trial.

19. Under United States v. Bukowski, 435 F.2d 1094 (7th Cir. 1970), certiorari denied, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809, to which we adhere, it was unnecessary to proceed here by way of grand jury indictment.

Birnbaum, and Bass were also counsel for Seale, Weinglass stated that Birnbaum and Bass were merely local counsel and were never intended as trial counsel, and Tigar was only engaged as a specialist to argue defense motions on wiretapping. Mr. Birnbaum, speaking for himself and Mr. Bass, corroborated Weinglass' assertion that they were acting only as local counsel in accordance with the court rule requiring local counsel.[20] The trial court simply stated it was of "the opinion that either Mr. Bass or Mr. Birnbaum could represent any one of their clients and do a good professional job" and so found. No inquiry was addressed to the desires of Seale, who was then incarcerated in California; the court relied exclusively on the appearances filed by Bass and Birnbaum in Seale's behalf.

At the September 9, 1969, hearing on the renewed motion for a continuance based on Garry's impending operation, the trial court found that although normally the inability of retained counsel to serve would entail allowing his client to secure other counsel, that was unnecessary since other counsel were of record. Again the court noted that attorneys Birnbaum, Bass and Tigar had entered appearances for Seale. The court dismissed Garry's assertion that these attorneys had been engaged exclusively for pretrial work with the statement that they had entered general appearances, for there was no such thing as a limited appearance in a criminal case. Again the court did not advert to Seale's desires. Garry then told the court that Seale would be without counsel at the time he was brought to Chicago for trial from his San Francisco incarceration.

On September 24, when the trial commenced, Mr. Kunstler entered an appearance for Seale and defendants Hoffman, Froines, and Weiner. At the same time, Kunstler told the court that all defendants took the position that they were not fully represented because of Garry's absence. He asked that all defendants be allowed to speak to that point, but the court refused. Weinglass then stated that Seale did not have counsel but the court silenced him with the response, "That is not a fact, as it appears from the record." Thereafter the court told the jury that Seale was represented by Messrs. Kunstler, Garry, Tigar, Birnbaum, and Bass.[21] Two days later, after the jury was impanelled but prior to the opening statements, Seale presented *pro se* his hand-written motion requesting postponement until Garry could be present to represent him. The motion, which was denied, also dismissed all counsel of record except Garry. Later that morning, Seale attempted *pro se* to make an opening statement and reiterated that his lawyer was Garry. Upon being interrogated by the court, Mr. Kunstler replied that he did not represent Seale, but the court concluded otherwise because Kunstler had filed an appearance in Seale's behalf, although Kunstler explained that his appearance for Seale had been limited to giving him access from jail to the outside world.

Thereafter the trial judge consistently adhered to his view that Kunstler's appearance was conclusive on the question of his representation of Seale. When on October 20 Seale presented a formal motion to proceed *pro se*, the trial court denied it on the grounds that Seale's self-representation would produce a "disruptive effect," would be inappropriate in view of the complexity of the case, and would be more prejudicial to his defense than a denial of the motion. To

20. General Rule 7(a) of the court below provides:
"An attorney not having an office within this district shall appear before this court only upon having designated, at the time of filing the initial notice or pleading, a member of the bar of the court having an office within this district upon whom service of papers may be made."

21. On September 29 and 30 respectively, attorneys Tigar and Bass were granted leave to withdraw, and on October 20 Birnbaum was excused from daily trial attendance.

this position the trial judge likewise consistently adhered.

 We note the trial judge's earlier reliance on the appearances of attorneys Tigar, Birnbaum, and Bass in view of his felt need to begin the trial on schedule and the difficulty of immediately confronting the absent Seale. Moreover, we sympathize with his later dependence on Kunstler's appearance in view of Kunstler's previous statement that the defendants had agreed to be represented by a trial team consisting of himself and attorneys Garry and Weinglass and in view of the progressing time. However, nothing in the appearance rule negates a limited appearance. (See note 1, *supra.*) Even if limited appearances were precluded, the trial judge would be justified in relying on the appearance rule only to control the relationship between the court and counsel or between counsel and clients desirous of their representation. He would not be justified in using any such rule to determine summarily the attorney-client relationship at least where, as here, there was protestation that the appearances did not in fact reflect the true consensual relationship between the defendant and the attorneys of record for him. Certainly Seale could not be bound by the appearances of counsel engaged only for pretrial work when, perhaps, their specialized employ was only the delegation of chosen trial counsel. Neither could Seale be bound by Kunstler's action in filing an unauthorized appearance. In sum, the right to counsel of choice could not be denied by exclusive recourse to appearances on record where Seale did not actually agree to the trial reresentation of the appearing attorneys or where he was not shown to be engaging in unwarranted dilatory tactics.

The Government argues that the grant of a continuance is a matter left solely to the sound discretion of the trial judge.[22] The denial of a continuance below is said to have been proper, *inter alia,* in view of the fact that Seale had other counsel of record. The point is, however, that the trial judge was confronted from the very beginning with objections that these attorneys of record were not in fact counsel chosen by the defendant to represent him at trial.

 The Government has cited no authority to show that a trial judge may eschew inquiry into the objections of a defendant who unexpectedly finds himself without chosen trial counsel.[23] If the Sixth Amendment right to the effective assistance of counsel means anything, it certainly means that it is the actual choice of the defendant which deserves consideration. This is not to say that Seale was unequivocally entitled to a continuance until Garry could be present. But if an inquiry disclosed that this defendant had never consented to be represented at trial by the other record attorneys in Garry's absence, was unwilling to proceed with any counsel except Garry and was sincere in his position, other alternatives were available to the trial court. The grant of severance and a reasonable continuance to secure substitute counsel or leave to Seale to represent himself would have permitted the trial to continue promptly and may well have obviated many of the difficulties that later occurred.

The Govenment argues that the trial court was not obligated to inquire of Seale whether he desired to represent himself until he unequivocally asked to proceed *pro se* and points to the fact that Seale did not formally file a motion to act in his own defense until October 20,

22. *See, e. g.,* Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921; Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377.

23. Seale alleged that he first learned on the night of September 25 that Garry had to be hospitalized for surgery and would not be at the trial.

the seventeenth day of trial.[24] By that time, the Government contends the trial was well under way, and accordingly Seale's right to proceed *pro se* was strictly limited, exercisable only in the trial court's sound discretion.[25]

We agree with then Circuit Judge Burger, concurring in Brown v. United States, 105 U.S.App.D.C. 77, 264 F.2d 363, 368 (D.C.Cir.) (*en banc*), certiorari denied, 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1958), that "[t]he issue here is not whether an accused has a right to try his own case in proper person; nor is the issue whether an accused must in all circumstances be informed explicitly by the court that he had a right to proceed as his own counsel. The heart of the matter is the scope of discretion of the trial court when an objection to counsel is made known." Here the trial court was put on notice when hearing the continuance motions on August 27 and September 9, and when conducting the pretrial procedings on September 24, that Seale was dissatisfied with any counsel except Garry. Moreover, on September 26, at the earliest opportunity after the impanelling of the jury,[26] Seale's *pro se* motion advised the court that he had relieved all other counsel of record for him in Garry's absence. Soon thereafter he attempted *pro se* to make an opening statement to the jury, thus reiterating his non-acceptance of these attorneys of record. Since Seale had amply indicated dissatisfaction with counsel, the trial court was under a duty to inquire into the subject. As then Circuit Judge Burger explained in his concurring opinion in Brown v. United States, *supra* at 369, the entire court there agreed on the following proposition which he espoused:

"[W]hen, for the first time, an accused makes known to the court in some way that he has a complaint about his counsel, the court must rule on the matter. If the reasons are made known to the court, the court may rule without more. If no reasons are stated, the court then has a duty to inquire into the basis for the client's objection to counsel and should withhold a ruling until reasons are made known."

See United States v. Mitchell, 138 F.2d 831 (2d Cir. 1943), certiorari denied, 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 1083 (1944); United States v. Birrell, 286 F.Supp. 885 (S.D.N.Y.1968). We are in accord. Since the trial judge was bound to look into the basis of Seale's dissatisfaction with his lawyers of record apart from the hospitalized Mr. Garry, failure to do so was an abuse of discretion.

It is immaterial whether Seale had a right to a continuance until Mr. Garry

---

24. In support of its contention the Government relies on a number of cases which require an express request in order to invoke the right to act *in propria persona*. E. g., United States v. Clausell, 389 F.2d 34, 35 (2d Cir. 1968); United States ex rel. Maldonado v. Denno, 348 F.2d 12, 15 (2d Cir. 1965), certiorari denied, DiBlasi v. McMann, 384 U.S. 1007, 86 S.Ct. 1950, 16 L.Ed.2d 1020; Brown v. United States, 105 U.S.App. D.C. 77, 264 F.2d 363, 366, certiorari denied, 360 U.S. 911, 79 S.Ct. 1299, 3 L. Ed.2d 1262 (1959); United States v. Gutterman, 147 F.2d 540, 542 (2d Cir. 1945); United States v. Mitchell, 137 F. 2d 1006, 1010 (2d Cir. 1943), adhered to on rehearing, 138 F.2d 831 (2d Cir. 1943), certiorari denied, 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 1083. While under our mode of analysis there is no occasion to express an opinion on this question, it may be noted that the above rule was not enunciated without able dissent and that its acceptance is not unquestioned. United States v. Mitchell, *supra*, 137 F. 2d at 1011, and United States v. Gutterman, *supra*, 147 F.2d at 542–543 (Judge Frank, dissenting); Brown v. United States, *supra*, 364 F.2d at 369 (Judges Washington, Edgerton, Bazelon, and Fahy dissenting); United States v. Plattner, 330 F.2d 271, 276–277 (2d Cir. 1964). For what is conceded by the majority view to be "preferable procedure," see United States v. Clausell, *supra*; United States v. Abbamonte, 348 F.2d 700, 704 (2d Cir. 1965), certiorari denied, 382 U.S. 982, 86 S.Ct. 557, 15 L.Ed.2d 472.

25. See note 27 *infra*.

26. See pp. 350, 357 *supra*.

could represent him or had a right to appear *pro se.* What is crucial is that in the circumstances of this case, the trial judge had a duty to inquire of Seale as early as August 27 and no later than September 26 [27] as to his objections to counsel of record and to take appropriate action to make sure that his Sixth Amendment right to the assistance of counsel and his right to represent himself were appropriately honored.[28]

As shown in a November 4 colloquy between the trial court and Seale, if there had been an inquiry of Seale about the authorization of Kunstler's appearance, Seale apparently would have told the court that he never had a pretrial conference with Kunstler (but see note 2 *supra*), that Garry was the only lawyer to whom he talked regarding his case, that he was never asked regarding Kunstler's filing of an appearance, and that Kunstler had appeared on his own accord without any request by or consultation with Seale. Judging from Seale's September 26 motion and his attempt to make an opening statement in his own behalf as well as from his subsequent demands for and attempts at self-representation, it is only realistic to assume that *during the requisite inquiry* Seale would have expressly voiced his desire to proceed *pro se* in the event a continuance was disallowed. We note only that if the above facts regarding Kunstler's attorneyship were found true

and Seale was found to be free of ulterior motivation, it would have been error for the trial court to force Kunstler's services upon Seale over his insistence on defending himself.

The Government relies on this Court's opinion in United States v. Cozzi, 354 F. 2d 637 (1965), certiorari denied, 383 U.S. 911, 86 S.Ct. 896, 15 L.Ed.2d 666. When that cause was called for trial, John Cogan, attorney for Cozzi, explained that because of a prosecution subpoena served on Anthony Butera, Jr., whom he had also represented, there appeared to be a conflict of interest. However, the prosecutor assured the court Butera would not be called as a witness, so that the court quite properly refused to allow Cogan to withdraw as Cozzi's counsel. There the defendant was not complaining that any counsel was being imposed upon him instead of counsel of choice. As we said,

"Cozzi does not question the competency of Cogan, counsel of his own selection, nor the quality of Cogan's representation. There is no suggestion that Cogan's original undertaking to represent both Cozzi and Butera [who had previously been convicted upon a guilty plea] involved any conflict of interest—or possible prejudice to either defendant." 354 F.2d at 639.

*Cozzi* was a case where a single reason—conflict of interest—was inquired into,

---

27. Of course, the duty to give consideration to the desires and predicaments of Seale persisted thereafter. When requests to discharge counsel and proceed *pro se* are voiced in the middle of the trial, considerable weight is accorded the trial judge's balancing of the interests involved. But the trial judge must make his determination on the basis of the "facts and circumstances of this case." Sanchez v. United States, 311 F.2d 327, 332 (9th Cir. 1962), certiorari denied, 373 U.S. 949, 83 S.Ct. 1678, 10 L.Ed.2d 704. The question is whether "the prejudice to the legitimate interests of the defendant overbalances the potential disruption of the proceedings already in progress," United States ex rel. Maldonado v. Denno, 348 F.2d 12, 15 (2d Cir. 1965) certiorari denied, DiBlasi v. McMann, 384 U.S. 1007,

86 S.Ct. 1950, 16 L.Ed.2d 1020. A legitimate interest of the defendant is certainly to avoid putting his defense in the hands of counsel whom he does not trust and whom he has never chosen. Again the trial judge could not make an informed exercise of discretion without inquiring into the facts and circumstances relevant to the legitimate interests of Seale. See United States v. Foster, 9 F.R.D. 367, 371–373 (S.D.N.Y.1949).

28. There is no need to resolve here the issue whether the right to represent oneself is constitutionally based or based solely upon 28 U.S.C. § 1654 and Rule 44 of the Federal Rules of Criminal Procedure. See Dearinger v. United States, 344 F.2d 309, 311 n. 2 (9th Cir. 1965).

assessed and correctly found insufficient to warrant substitution of counsel. Since Cozzi's position was simply an adoption of Cogan's conflict of interest objection, we of course held that the trial court did not err in declining personally to interrogate the defendant concerning Cogan's request for substitution. *Cozzi* is not inconsistent with our present holding that in this case it was error not to interrogate Seale about his objection to counsel other than Garry.[29]

*Trial Court's Adverse Rulings Did Not Justify Seale's Contemptuous Conduct*

■ From the foregoing it is clear that the trial court erred in failing to inquire into the basis for Seale's dissatisfaction with his counsel of record other than Garry. However, because such an inquiry might have found the facts to be at odds with Seale's allegations or conceivably have yielded a justifiable conclusion on the part of the trial judge that Seale was manipulating his constitutional right to counsel or right to represent himself in order to delay and disrupt the proceedings,[30] we cannot say from our vantage point that Seale had unequivocal rights to be represented by Garry or to represent himself and that these rights were denied. Assuming these rights were wrongfully denied, it is clear that such error, and certainly the one the trial judge did commit, would not justify contumacious conduct.

■ It is well settled that the invalidity of a court order is not generally a defense in a criminal contempt proceeding alleging its disobedience. Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210; United States v. United Mine Workers, 330 U.S. 258, 293–294, 67 S.Ct. 677, 91 L.Ed. 884; Howat v. Kansas, 258 U.S. 181, 189–190, 42 S.Ct. 277, 66 L.Ed. 550; United States v. Bukowski, 435 F.2d 1094, 1108 (7th Cir. 1970), certiorari denied, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809; United States v. Hammond, 419 F.2d 166, 168 (4th Cir. 1969); United States v. Tijerina, 412 F.2d 661, 666 (10th Cir.), certiorari denied, 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969). Of course this principle applies to defeat any contention that obstructive and disruptive courtroom conduct is excused because it protests an erroneous ruling. Perhaps the most recent pronouncement to that effect is in Illinois v. Allen, 397 U.S. 337, 346–347, 90 S.Ct. 1057, 1062, 25 L.Ed.2d 353, where Mr. Justice Black, in delivering the opinion of the Court, observed that courts are bound to make some errors but errors do not justify a defendant's infection of courtroom proceedings "with the sort of scurrilous, abusive language and conduct paraded before the Illinois trial judge in this case." There Allen was insisting on his Sixth Amend-

29. The other cases cited by the Government are also readily distinguishable. In none of them was the complaint made that the trial judge failed to look into the basis for the defendant's dissatisfaction with counsel. Rather the appellants were arguing that the trial judge abused his discretion by ruling the asserted basis insufficient to warrant a continuance or dismissal of counsel, or put forth in bad faith. Often the circumstances surrounding the request were such that they enabled the district judge properly to conclude that the purported basis was not genuinely advanced. See, *e. g.*, United States v. Catino, 403 F.2d 491, 497–498 (2d Cir. 1968), certiorari denied, Pagano v. United States, 394 U.S. 1003, 89 S. Ct. 1598, 22 L.Ed.2d 780; Rolon Marxuach v. United States, 398 F.2d 548–551 (1st Cir. 1968), certiorari denied, 393 U.S. 982, 89 S.Ct. 454, 21 L.Ed.2d 443; Kobey v. United States, 208 F.2d 583, 592–594 (9th Cir. 1953); United States v. Vrilium Products, 185 F.2d 3, 5 (7th Cir. 1950), certiorari denied, 340 U.S. 947, 71 S.Ct. 531, 95 L.Ed. 683.

30. See Marxuach v. United States, 398 F.2d 548, 551 (1st Cir. 1968), certiorari denied, 393 U.S. 982, 89 S.Ct. 454, 21 L. Ed.2d 443; United States v. Birrell, 286 F.Supp. 885, 894–896 (S.D.N.Y.1968); United States ex rel. Davis v. McMann, 386 F.2d 611, 618–619 (2d Cir. 1967); Relerford v. United States, 309 F.2d 706, 708 (9th Cir. 1962).

ment rights, just as Seale was. Therefore, it is clear that even an error respecting such fundamental constitutional rights does not excuse contumacious conduct inspired thereby. See Walker v. City of Birmingham, *supra* (both the injunction and ordinance upon which it was based were "unquestionably" constitutionally suspect).

Similarly, in United States v. Sacher, 182 F.2d 416, 430 (2d Cir. 1950), affirmed, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717, involving contemptuous conduct of attorneys during a celebrated Smith Act trial,[31] a distinguished panel of the Second Circuit was faced with the contention that grievous errors committed by the trial judge [32] provoked their reactions and thus vitiated the contempt citations imposed therefor. Speaking for the Court, Judge Augustus Hand pointed out that irrespective of whether error was committed or not, the defendants had no license to obstruct the trial. "Their only remedy is by an appeal." (See also the concurring opinion of Judge Frank, 182 F.2d at 454.)

Though he was speaking more of the trial judge's demeanor, Judge Wilkin's ruling in United States v. Offutt, 145 F. Supp. 111, 114–115 (D.D.C.1956), modified, 247 F.2d 88 (D.C.Cir.), certiorari denied, 355 U.S. 856, 78 S.Ct. 85, 2 L.Ed. 2d 64 (1957), is equally apposite to this case where the claims are made that the trial judge's rulings manifested his hostility towards Seale's contentions and that the judge attempted to coerce a waiver of Seale's Sixth Amendment rights. In language peculiarly appropriate here, the Judge said:

"It is the finding and judgment of this Court that the conduct of the trial judge did not justify or excuse the challenged conduct of trial counsel. It is the opinion of this Court that improper conduct of a trial judge can never justify or excuse contemptuous conduct of a trial attorney."

\* \* \* \* \* \*

"Two wrongs do not make a right, and misconduct cannot obliterate other misconduct. It is the duty of all participants in a trial to maintain the dignity and good order of the courtroom."

\* \* \* \* \* \*

"Judicial impropriety cannot be considered a complete defense, but only an extenuating circumstance."

See Sacher v. United States, 343 U.S. 1, 39, 72 S.Ct. 451, 469, 96 L.Ed. 717 (Frankfurter, J., dissenting): "Counsel are not freed from responsibility for conduct appropriate to their functions no matter what the encouragements and provocations. Petitioners must be held to strict accountability for the contempts they committed." See also Flaum & Thompson, The Case of the Disruptive Defendant: Illinois v. Allen, 61 J.Crim. L.C. & P.S. 327, 337–338 (1970); Freund, Contempt of Court, 1 Human Rights 4, 8–9 (ABA Section of Individual Rights and Responsibilities 1970).

The reason that the rulings of a trial judge, no matter how sincerely felt to be or in fact indefensible, cannot excuse contumacious protestation is that "[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country." Illinois v. Allen, *supra*, 397 U.S. at 343, 90 S.Ct. at 1061. "Preservation of the liberties of citizens, when on trial for crimes charged against them, demands order in the courtroom. Absent such order, no trial can be fair. More important, if criminal trials cannot go on in orderly fashion, then the defendants, if unpopular or if members of minority groups, may become the victims of that monstrous substitute for trials—mob violence." United States v. Sacher, *supra*, 182 F.2d

---

31. United States v. Dennis, 183 F.2d 201 (2d Cir.), affirmed, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

32. The trial judge was alleged to have barred the lawyers improperly from presenting evidence in their clients' behalf and from stating objections to his rulings adverse to those clients.

at 454 (concurring opinion of Judge Frank). It is precisely because appellate courts sit to vindicate error that this principle is viable. Thus it is that he who would make himself the "judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion," (Walker v. City of Birmingham, *supra*, 388 U.S. at 320–321, 87 S.Ct. at 1832), and who would resort to appeal by disruption in the courtroom commits "the most grievous of offenses—a crime against intelligence." Freund, *supra* at 9.

Seale contends, however, that he was unaware his claims were preserved for appellate review,[33] and that his conduct is explicable by his desire to make a record. He relies on In re McConnell, 370 U.S. 230, 82 S.Ct. 1288, 8 L.Ed.2d 434, for the proposition that this motivation exonerates him as a matter of law. But McConnell does not stand for the proposition that a good faith reasonable belief in the necessity to preserve a point for review justifies any conduct inspired thereby. In that case an attorney, prompted by the reasonable belief that it was necessary for him to ask questions before making an offer of proof to support review of the trial judge's ruling, was confronted with the court's order to desist from questioning before making the offer of proof. In response, he asserted his right to continue questioning and "propose[d] to do so unless some bailiff stops us." The Supreme Court's holding was very narrow: "[a] mere statement by a lawyer of his intention to press his legal contention until the court has a bailiff stop him * * *" does not amount to an obstruction of the administration of justice punishable as contempt under 18 U.S.C. § 401(1). 370 U.S. at 236, 82 S.Ct. at 1292. The Court was careful to emphasize that the petitioner never disobeyed the judge's order

by continuing the questioning along the line which the judge had forbidden. 370 U.S. at 235, 236, 82 S.Ct. 1288.

██ Whether Seale entertained a good faith reasonable belief in the necessity to continue his protestations in order to preserve his claims for review or to avoid being charged with waiver is a question which may be explored by the new judge on remand. However, open defiance of the trial court's directives to desist or disruptive persistence beyond all bounds of propriety would not be justified merely because Seale may have entertained the belief that some protest was called for. Where there is such defiance or obstructive excess of persistence, belief in the necessity to register objections for the record may reduce the degree of culpability but does not exonerate.[34]

██ Finally, Seale claims that the trial court's "erroneous" rulings forced him to fend for himself, and as a layman he was ignorant of how to make his objections without committing contempt in the court's eyes. In this way, he argues, the "erroneous" rulings justified any otherwise contumacious behavior. This claim must be taken as essentially indistinguishable from Seale's further claim that his conduct cannot be found contemptuous as a matter of law because inadequate warnings as to what conduct was impermissible violated due process. This contention will be discussed *infra*. However, the notion that the trial court's erroneous binding of Seale to Kunstler's representation necessarily left him ignorant of how to conduct himself contains a patent nonsequitur. While the trial court's holding of Kunstler to his appearance may not have obligated Kunstler to represent Seale affirmatively against Seale's wishes, we cannot say it relieved Kunstler of his ethical obligation to advise him as to

33. As a legal matter, Seale's claim that his representation rights were denied was preserved for appellate review from the time asserted. Federal Rules of Criminal Procedure 51, 52(b).

34. See Cooke v. United States, 267 U.S. 517, 538, 45 S.Ct. 390, 69 L.Ed. 767.

what was improper courtroom deportment.[35] As then Circuit Judge Burger has pointed out, we should not assume that a member of the bar has breached professional ethics.[36] In any event, whether Seale was not advised is a factual question bearing on the larger factual question of his reasonable awareness that his behavior violated minimal standards of courtroom propriety.

*Electronics Surveillance*

On April 17, 1970, two months after completion of the Anti-riot Act trial of David Dellinger, et al., the Government moved to supplement the record with some sealed surveillance logs relating to Seale's contempt conviction. Because the Seale contempt case was already pending on appeal, the motion was denied by the trial judge. Subsequently we granted the Government's motion for a limited remand so that the district court could consider the surveillance data.

On August 7, 1970, the district judge filed a memorandum of decision denying the Government leave to supplement the record on appeal on two grounds. The first ground was that Seale had no standing to object to the electronic surveillance because the Court's *in camera* examination of the sealed exhibit revealed that it "contains no record of any surveillance of either the persons or the premises of the defendant, Bobby G. Seale, his attorneys, the other seven (7) defendants in the case of United States v. David T. Dellinger et al., or of any attorney who appeared as counsel for those defendants." The second ground was that there was no possible taint is-

sue since the contempt conviction was based solely on what the court certified that it saw or heard in its actual presence. Rule 42(a) of the Federal Rules of Criminal Procedure.

 We too have examined the logs of the four monitored conversations. Under the Fourth Amendment, Seale has no standing to object to these logs, because they were not overhearings of his conversations nor did they occur on his premises. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176; United States v. Mirro, 435 F.2d 839 (7th Cir. 1970). However, the first paragraph of the earliest of the three logs is open to the construction that the overheard conversation was a link in a communication from a lawyer to Seale advising him with respect to his conduct in court. Eavesdropping on a relay between two intermediaries [37] constitutes a sufficiently "direct intrusion * * * into attorney-client discussions" (Hoffa v. United States, 387 U.S. 231, 233, 87 S.Ct. 1583, 1584, 18 L.Ed.2d 738) to give Seale standing to complain that his Sixth Amendment right to the assistance of counsel may have been disturbed. Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26; O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94; see Hoffa v. United States, 385 U.S. 293, 308, 87 S.Ct. 408, 17 L.Ed. 2d 374. Apart from this paragraph, the remainder of these logs does not reveal any possible impairment of the attorney-client relationship, so that Seale lacks standing with respect to them, as the district court held.

---

35. See Canon 16 of the Canons of Professional Ethics of the American Bar Association and of the Illinois State and Chicago Bar Associations, which was in effect during the course of the trial. See also Principle III(D) of the American College of Trial Lawyers' Report and Recommendations on Disruption of the Judicial Process.

36. Brown v. United States, 105 U.S.App. D.C. 77, 264 F.2d 363, 368 (concurring opinion), certiorari denied, 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1959).

37. The use of intermediaries for the purpose of transmitting information between attorney and client is not inconsistent with a justifiable expectation of confidentiality. See Rule 503(a) (5) of Revised Draft of Proposed Rules of Evidence for United States District Courts and Magistrates (March 1971) and Advisory Committee's Note, 51 F.R.D. 361, 363 (1971); McCormick, Handbook of the Law of Evidence, § 95 (1954). Cf. United States v. Kovel, 296 F.2d 918, 920–923 (2d Cir. 1961).

The logs in question were gathered by the Federal Bureau of Investigation after the Attorney General ruled that it was necessary to the national security to obtain them. Accordingly, these surveillances were arguably legalized by Section 802(3) of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 2511(3)).[38] The Attorney General's action was within the contemplation of the statute. However, the Sixth Circuit has recently held that this provision does not contain a grant of power and that as to domestic security, the Fourth Amendment proscribes electronic surveillances of this nature without judicial authorization. United States v. United States District Court for E. D. of Mich., 444 F.2d 651, certiorari granted, 403 U.S. 930, 91 S.Ct. 2255, 29 L.Ed.2d 708 (1971). On the other hand, if the Supreme Court rules to the contrary, these national security logs were properly withheld by the district court and no part of them need be disclosed barring a showing on remand that the Sixth Amendment would require a different result.[39]

Assuming that the holding of United States v. United States District Court for E. D. of Mich. is affirmed or still stands at the time of retrial of Seale's contempt, the question then arises whether Seale is entitled to a taint hearing under Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176. The Government argues that there was no taint because the Government's trial attorneys and the district court did not know of the existence of these logs and their contents. But in United States v. Fannon, 435 F.2d 364 (7th Cir. 1970), we held that unsworn answers of the prosecutor were insufficient to show lack of standing. Consistently with the *Fannon* case, sworn testimony, subject to cross-examination, of relevant Government witnesses must be submitted on remand to show lack of taint. See United States v. Fox, 455 F.2d 131, 132 (5th Cir. 1972). Furthermore, if the overheard message reached Seale, it might at his option be used on remand to show his state of mind and motivation at the time of the conduct, even though it had not influenced the decision of the trial

38. Section 802(3) provides:

"Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception

was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power."

39. If the Supreme Court does not reach the constitutional question presented in the *United States District Court for Eastern District of Michigan* case, we would nevertheless apply the Sixth Circuit's holding to this case.

In the *United States District Court for Eastern District of Michigan* case, the Solicitor General has urged the Supreme Court to reconsider the automatic disclosure rule of Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, and in the case of national security surveillance conducted without a warrant or court approval to permit courts "to make an initial *in camera* determination whether the information obtained by the surveillance is arguably relevant to a prosecution before turning the material over to a defendant." If this proposal should be accepted by the Supreme Court, paragraph 1 of the first of the four logs would have to be turned over to Seale because *in camera* we already determined *infra* that the information is arguably relevant here.

judge and was not known to the prosecutorial staff.[40]

■ In sum, under the Sixth Amendment, Seale presently has standing to entitle him to inspect the first paragraph of the October 8, 1969 log, subject to appropriate protective provisions to be imposed below before the taint hearing. If the Government is unwilling to permit such inspection, then the contempt proceedings against Seale must be dropped. *Alderman v. United States*, 394 U.S. 165, 181, 89 S.Ct. 961, 22 L.Ed. 2d 176.

*Legally Insufficient Specifications Against Seale*

Having determined that this case must be remanded for trial before a jury and another judge, we are called upon to ascertain which of the trial judge's specifications are insufficient as a matter of law to support a conviction. As a concomitant of that task, we will attempt to formulate both the issues which the jury will consider and the standards within which it must resolve them. First, however, we must deal with appellant's contention that the trial judge inadequately warned him that his conduct was considered contemptuous and that in consequence he is completely immune from a contempt conviction.

■ Under the intent standard which we will shortly enunciate, a defendant will be protected against the possible unfair surprise of being cited for contempt for conduct that could not be reasonably believed improper when committed. Accordingly, an absence of any warning that borderline conduct is regarded a contumacious could be fatal to a contempt citation therefor. See *United States v. Schiffer*, 351 F.2d 91, 95 (6th Cir. 1965), certiorari denied, 384

U.S. 1003, 86 S.Ct. 1914, 16 L.Ed.2d 1017. However, we have here a factual question and could not rule as a matter of law that Seale must be deemed ignorant of the character of his conduct in the absence of prior warning. Moreover, this is not a record devoid of any warning by the trial judge. In fact, quite the contrary appears, for the record is replete with admonitions.

■■ Contrary to appellant's contention, he need not specifically have been warned nor indeed be aware that his conduct could be visited with a criminal penalty as opposed to another type of sanction. See *United States ex rel. Shell Oil Co. v. Barco Corp.*, 430 F.2d 998, 1001 (8th Cir. 1970). Likewise, we reject appellant's contention that the imposition of physical restraints on him late in his aborted trial could have relieved him of any reasonable expectation of any further penalty for his conduct, either prior or subsequent to his binding and gagging. Suffice it to say that his reliance on *Yates v. United States*, 227 F.2d 848 (9th Cir. 1955), and *Daschbach v. United States*, 254 F.2d 687 (9th Cir. 1958), in this regard is completely misplaced due to the entirely different situations portrayed in those cases. Finally, the contention that the manner and timing of the warnings given created confusion as to what conduct was permissible is one to be made before the trier of fact on remand.

■ Four elements are required in order to support a contempt conviction under Section 401(1).[41] First, the conduct at issue must constitute "misbehavior." We would define it as conduct inappropriate to the particular role of the actor, be he judge, juror, party, witness, counsel or spectator.[42] Generally these roles have been molded to in-

---

40. Cf. *Taglianetti v. United States*, 398 F.2d 558, 570–571 (1st Cir.), affirmed, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed. 2d 302 (1969), where the intercepted attorney-client conversations did not deal with the offense charged and were patently irrelevant.

41. The substantive contempt power for federal courts is contained in 18 U.S.C. § 401. For the pertinent text of the statute, see note 9, *supra*.

42. Cf. *Katz v. Murtagh*, 28 N.Y.2d 234, 321 N.Y.S.2d 104, 109, 269 N.E.2d 816, 820 (Ct.App. of N.Y.1971).

sure that a judicial proceeding is orderly, dignified, and confined to a rational search for truth in the context of defined legal issues. "There must be silence, except as the orderly conduct of business calls for speech." United States ex rel. Robson v. Malone, 412 F.2d 848, 850 (7th Cir. 1969). And when speech is thus called for, the speaker may use only his allotted time and fill it with relevance and moderation. See Sacher v. United States, 343 U.S. 1, 9, 72 S.Ct. 451, 96 L. Ed. 717. The particular standards of demeanor for each participant in a court of law or in connection with judicial proceedings have become solidified in tradition and do not need elaboration here. We leave their articulation to the judge presiding on remand and their application to the conduct in question to the trier of fact. We note only that the standards of proper courtroom decorum are not altered and should not be applied differently because a trial may be characterized as political or because improprieties may be said to spring forth as if a "natural human response." Were it not for the misconceptions apparent in this case, we would have thought this too obvious to mention.

The statute secondly requires the misbehavior to rise to the level of an "obstruct[ion of] the administration of justice." We will deal with this element of the offense shortly, but note now that its presence is clearly required in order that misbehavior be punishable as contempt. In re McConnell, 370 U.S. 230, 234, 82 S.Ct. 1288, 8 L.Ed.2d 434.

Third, it is evident from a reading of the statute that the conduct in question must be in the court's presence or so proximate that it obstructs the administration of justice. Since the conduct in issue here took place in the court's presence, this requirement needs no further elaboration.

Fourth, virtually every decision under this Section has required some form of intent to obstruct. It is this requirement

together with that of obstruction which concerns us here.

Taking the element of intent first, it should be observed initially that this requirement has received a variety of treatment by different courts. For example, while numerous courts, including this Court, have apparently required a specific finding of wrongful intent (e. g., In re Brown, 454 F.2d 999, 1003, 1007 (D.C.Cir.1971); United States v. Jackson, 426 F.2d 305, 309 (5th Cir. 1970); United States v. Sopher, 347 F.2d 415, 418 (7th Cir. 1965)), a standard urged by appellant Seale, the Government has vigorously argued that the lesser requirement enunciated in Offutt v. United States, 232 F.2d 69 (D.C.Cir.), certiorari denied, 351 U.S. 988, 76 S.Ct. 1049, 100 L.Ed. 786 (1956), be applied. In *Offutt*, the court established a two-part test for the intent requirement. This was done by distinguishing between contempts involving "clearly blameworthy" conduct and those involving other less serious conduct. Where "clearly blameworthy" conduct is present the court held that "a finding of contumacious intent is not always a prerequisite to a contempt conviction under 18 U.S.C. § 401(1)." On the other hand, where "clearly blameworthy" conduct is absent, "there is no contempt unless there is some sort of wrongful intent." *Offutt, supra* at 72.

Apparently the *Offutt* court accepted the general proposition that a finding of specific intent is required for a contempt conviction, but believed that certain conduct which could be designated "clearly blameworthy" carried with it some form of self-evident intent which negated the need for a specific finding.[43] The *Offutt* dichotomy creates problems in the area of determining what conduct is "clearly blameworthy" (or "patently contemptuous" as the Government has defined it) by removing the requirement of a finding of specific intent in some such cases. We are persuaded that the better

43. See Harper and Habor, Lawyer Troubles in Political Trials, 60 Yale L.J. 1, 18–19 (1951).

position is strictly to require a finding of intent in every case.[44] See Morissette v. United States, 342 U.S. 246, 274–276, 72 S.Ct. 240, 96 L.Ed. 288. And, as was emphasized recently in In re Brown, 454 F.2d 999, 1007 (D.C.Cir. 1971), "proof beyond a reasonable doubt that the alleged contemnor possessed the required intent must forerun a criminal contempt conviction." See also United States ex rel. Porter v. Kroger Grocery and Baking Co., 163 F.2d 168 (7th Cir. 1947).

The requirement of proof of intent is, however, the beginning, not the end, of the inquiry, for the manner in which the requisite intent is defined is equally important. On this question, we also find a disparity of treatment. The poles of the intent issue are rather easily defined; at one extreme is the theory that all that is required is a willful or volitional act without regard to the known or intended consequences of the act, and at the other is the requirement that the contemnor actually intended his act to obstruct the judicial process. The appellant contends that the requisite intent is limited to the latter situation. He would define it as a "vicious will" or a "culpable intent to obstruct justice" and argues that any less stringent standard would have an "extraordinary chilling effect on a vigorous defense." See Caldwell v. United States, 28 F.2d 684 (9th Cir. 1928). In support of this position, great emphasis is placed upon the decision of this Court in United States v. Sopher, 347 F.2d 415, 418 (7th Cir. 1965), in which it was noted that "positive evidence of a deliberate intent to pursue a *course of improper argument* or prohibited conduct" was absent. Appellant would construe this language to require the presence of intent as he has defined it, but the language does not require such interpretation and the holding of the case was that no actual obstruction had been shown. 347 F.2d at 418.

■ The Government responds to this position with the argument that the contemnor need not know that his actions are contumacious. It contends that it is sufficient that he "know what he is doing so that his misconduct does not occur by accident, inadvertence or other innocent reason." See United States v. Polizzi, 323 F.Supp. 222, 226 (C.D.Cal. 1971). To us, neither formulation offers a viable standard. The minimum requisite intent is better defined as a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful. See United States v. Cullen, 454 F.2d 386, 392 (7th Cir. 1971); cf. In re Brown, *supra,* 454 F.2d at 1007, 1009, and Sykes v. United States, 144 U.S.App. D.C. 53, 444 F.2d 928, 930 (1971). Of course, an actual design to subvert the administration of justice is a more

---

44. Quite apart from the difficulties occasioned by the elusive concept of "clearly blameworthy," there are salutary reasons for requiring proof of wrongful intent, especially where the *conduct* of attorneys and defendants acting as their own counsel is questioned. In this regard, Professor Dobbs' exhaustive article on contempt, Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 265 (1971), offers some illumination. Discussing the intent dichotomy in *Offutt,* Professor Dobbs characterizes the formulation as "not a happy one" and offers the following analysis:

"It can be used all too easily to impose a kind of strict criminal liability without fault. Quite aside from that, it could serve to seriously impede effective advocacy of lawyers and subvert the independence of the bar if lawyers were subject to contempt charges based on zealousness and no more. Finally, Judge Fahy's formulation of the rules may have a serious procedural effect. If *intent is not recognized as an element* of these contempts, summary proceedings may suffice where otherwise a full hearing would be required to develop the intent element."

The Ninth Circuit was equally aware of the problem when it stated in Caldwell v. United States, 28 F.2d 684 (9th Cir. 1928), that punishing conduct "where the intent to be insubordinate is not clear, might very well have the result of deterring an attorney of less courage and experience from doing his full duty to his client." See also In re Watts and Sachs, 190 U.S. 1, 29, 23 S.Ct. 718, 47 L.Ed. 933.

grievous and perhaps more culpable state of mind, but proof of such an evil motive is unnecessary to establish the required intent. United States v. Cullen, *supra*.

Certainly the most obvious source from which this intent can be ascertained is the trial transcript. United States v. McCarthy, 196 F.2d 616, 619 (7th Cir. 1952); United States ex rel. Porter v. Kroger Grocery and Baking Co., *supra*. Indeed, some conduct depicted therein will itself carry sufficient indicia of intent to satisfy the Government's burden of proof on this issue. However, as noted elsewhere in this opinion, the hearing on remand need not be confined to the record.

An equally pervasive issue on remand is the determination of whether the specified conduct, which may be found to be misbehavior, rose to the level of an obstruction of the judicial process within the meaning of Section 401(1) (note 9 *supra*). Obstruction is an elusive concept which does not lend itself to general statements. The tendency has been for courts to treat each case on its individual facts and there are, therefore, few decisions which aid in the determination of the proper standards for the jury in this case. Appellant asks that a standard of "material and substantial" be applied. The Government would have "any interruption" made punishable when it "diverts the judge's attention from the orderly dispatch of the trial." Notably, neither standard finds unequivocal support in authority.

The Supreme Court has touched upon the issue in very general terms, teaching us in In re McConnell, 370 U.S. 230, 236, 82 S.Ct. 1288, 8 L.Ed.2d 434, that the conduct must amount to an "actual obstruction of justice"; in In re Michael, 326 U.S. 224, 227, 66 S.Ct. 78, 90 L.Ed. 30, that it must effect the "immediate interruption" of the court's business; and in Ex parte Hudgings, 249 U.S. 378, 383, 39 S.Ct. 337, 63 L.Ed. 656, that the obstruction must be "clearly shown." Beyond this, courts have assiduously avoided enunciating a standard. In the context of the instant case, however, where the proceedings are being remanded for trial by jury, something more is needed. We find, therefore, that the standard to be applied is one of material disruption or obstruction. Clearly, the Government's proposed "any interruption" standard is too encompassing, for trials are by nature adversary and contentious, and few proceed without some form of interruption. The power of contempt was not fashioned to stifle the search for truth through adversary proceedings; rather it was designed to preserve it by punishing actual, material obstruction of these proceedings. However, we realize that the seriousness of the misbehavior bears on what conduct may be found materially obstructive.

While it is difficult to enunciate general rules defining obstruction, it is easier to state in the negative what type of conduct does not rise to the level of obstruction. For example, it has frequently been held, and considerable scholarly comment supports the view, that mere disrespect or affront to the judge's sense of dignity will not sustain a citation for contempt.[45] The line be-

---

45. In Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11, the Supreme Court rejected the notion that protection of the judge's personal dignity was a permissible exercise of the contempt power. Four years later in Brown v. United States, 356 U.S. 148, 153, 78 S.Ct. 622, 626, 2 L.Ed.2d 589, the Court cautioned trial judges "against confusing offenses to their sensibilities with obstruction to the administration of justice." See also In re McConnell, *supra*; Ex parte Hudgings, *supra*; and In re Michael, *supra*. Astutely, Professor Dobbs observed in his article on contempt—Dobbs, *supra* at 208:

"Where nothing more than disrespect or discourtesy is involved, however, the dangers of abuse of contempt power may outweigh the benefits of using that power. The readiness of some judges to find contempt in perfectly respectful conduct, and readiness of others to induce it by behavior on the

tween insult and obstruction, however, is not clearly delineated, and at some point disrespect and insult become actual and material obstruction. The Supreme Court, in In re Little, 404 U.S. 553, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972), has recently shed some light on where that line is to be drawn. In *Little*, the Court reversed the contempt conviction of a defendant arguing *pro se* who made allegations before the jury that the *nisi prius* court by its bias had prejudiced his trial and that he was a political prisoner. The trial court found that the remarks were "very disrespectful" and that they "reflected on the integrity of the Court and tended to subvert and prevent justice." In effect, the Supreme Court concluded that it was improper for the court to have slid so easily from the first conclusion to the second. Quoting from Brown v. United States, 356 U.S. 148, 153, 78 S.Ct. 622, 626, 2 L.Ed.2d 589, the Court said, "Trial courts * * * must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice." In an effort to draw the line between mere disrespect and obstruction, the Court continued, "The fires which [the language] kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil." Thus in view of the fact that Little's remarks came during his summation to the jury, a period which lends itself easily to the interjection of prejudice, the Supreme Court seems to have expressed a high degree of tolerance in distinguishing disrespect from obstruction. A showing of imminent prejudice to a fair and dispassionate proceeding is, therefore, necessary to support a contempt based upon mere disrespect or insult.

In determining whether the disrespectful remarks so imperil the proceeding, "the reasonably to be expected reactions of those in the courtroom to the words or acts under scrutiny are relevant." Parmelee Transp. Co. v. Keeshin, 292 F.2d 806, 810 (7th Cir. 1961). And as we further explained in that case, "We must * * * bear in mind that the test of contumaciousness of words spoken during a court proceeding is their effect as contemporaneously understood by those who heard the words spoken in the courtroom. This includes the judge as well as other persons present." *Id.*

Of course, the manner in which insulting remarks, not obstructive of themselves, are leveled may accomplish an obstruction. For example, shouting the remarks or accompanying their utterance with physical demonstration may provide the necessary element. Moreover, the very delay of the proceedings occasioned by a disrespectful outburst or other misbehavior may be sufficient to constitute a material obstruction. Thus, if a not insubstantial delay is entirely unnecessary and the misconduct serves, for instance, solely to vent the speaker's spleen, the requisite obstruction would be present.

Before leaving the subject of disrespect and affront to the judge's sensibilities comment is needed on the argument advanced by Seale that consideration should be given to the fact that language patterns and word choice vary greatly between diverse social, ethnic, economic and political groups. It is manifest that words scarcely used by some persons may be every-day language to many people who appear in courts. While these differences are relevant to the inquiry into intent, there can be little doubt that the jury is best suited to resolve this question.

bench, suggest these dangers of abuse. Finally, it should be emphasized that mere personal insult or irritating conduct should not readily be accepted as contempt. The nature of the trial as an honest human effort to reach a just result must be preserved and enhanced, and no person by his conduct should create an atmosphere that makes this impossible. But personal discourtesy or insult is on an altogether more trivial plane, and a certain amount of that should be tolerated when it falls short of interfering with the nature of the trial."

On the positive side of the obstruction question, failure to heed the directive of the court to desist from arguing, to sit down, or to remain quiet may indeed constitute an actual material obstruction to the administration of justice. The unmistakable implication of In re McConnell, 370 U.S. 230, 235, 236, 82 S.Ct. 1288, 8 L.Ed.2d 434, is that defiance of the court's order to cease questioning would have actually obstructed the proceedings.[46] As governor of the trial, the trial judge must have the authority necessary to ensure the orderly and expeditious progress of the proceedings. His directives in exercise of this authority must be obeyed; otherwise the clear result would be courtroom chaos. Wholly arbitrary limits on argument will, if prejudicial, merit reversal of the substantive case, but that hardly can excuse open defiance of the court's commands. United States v. Offutt, 145 F.Supp. 111, 114 (D.D.C.1956), modified, 247 F.2d 88 (D.C.Cir.), certiorari denied, 355 U.S. 856, 78 S.Ct. 85, 2 L.Ed.2d 64 (1957); see United States v. Sacher, 182 F.2d 416, 430 and 454 (concurring opinion of Frank, J.) (2d Cir. 1950), affirmed, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717. We do not say that automaton-like reflexive obedience to the court's orders is necessary to avoid a contempt citation. The law does not expect unhuman responsiveness. A certain amount of leeway must be allowed. But where the directive is clear, the judge's insistence on obedience is not undercut by his further rejoinder, and the party directed understands what is being asked of him, he must obey. See Jones v. United States, 80 U.S.App. D.C. 109, 151 F.2d 289, 290 (1945); United States v. Bollenbach, 125 F.2d 458, 460 (2d Cir. 1942).

Applying the above standards to the contempt specifications against Seale, we find charges 1, 2, 3 and 5 insufficient as a matter of law. The full text of the trial judge's specifications appears in the Appendix to this opinion. In resolving the legal sufficiency of these specifications, we have determined that regardless of the intent with which the conduct was engaged in, no actual, material obstruction occurred which would warrant imposition of the contempt sanction. This does not imply that the twelve specifications which are being sent back for jury trial necessarily depict obstructions or show the other elements of misbehavior and wrongful intent necessary for a contempt conviction. As the Supreme Court observed in Fisher v. Pace, 336 U.S. 155, 161, 69 S.Ct. 425, 428, 93 L.Ed. 569, "In a case of this type the transcript of the record cannot convey to us the complete picture of the courtroom scene. It does not depict such elements of misbehavior as expression, manner of speaking, bearing, and attitude of the petitioner." At the hearing on remand, the jury must consider these elements as the factual setting is unfolded before it. With respect to those specifications remanded, the jury must consider the factual questions bearing on misbehavior, obstruction and on intent. Insofar as the conduct delineated in the legally insufficient specifications may bear on those factual questions for the remaining specifications, the jury may consider that conduct, which forms part of the record, admissible against the appellant. See p. 372, *infra*.

*Proceedings on Remand*

First of all, we agree with the Government that any district judge who has officially expressed an opinion in this case should not sit in judgment.[47] Consequently this case will be returned to the district court's Executive Committee for reassignment pursuant to its rules.

At the remand, the specifications we have upheld as a matter of law should

---

46. See Comment, 14 Syracuse L.Rev. 114, 117 (1962).

47. Government's brief in In the Matter of David Dellinger et al., No. 18294, p. 368, note 485.

be treated as charges against Seale and have no other effect.[48]

Jurors infected by any prejudicial publicity against Seale will of course not be permitted to serve.

The present contempt certificate in conjunction with this opinion is sufficient to satisfy the due process requirement of notice of the accusations and the purpose of Rule 42(b) of the Federal Rules of Criminal Procedure, which requires a statement of the "essential facts constituting the criminal contempt charged." Due to the danger that the jury might give undue weight to the trial judge's inferential findings and descriptions contained in the preface and conclusion of the contempt certificate (see Appendix), these findings and descriptions shall not be placed before the jury. However, the judge handling this case on remand may reformulate as accusations those findings which properly constitute elements of the offense charged. The revised certificate must be given to the defendant and an announcement of the time and place of the hearing must be made sufficiently in advance of the hearing date to permit reasonable preparation.

All charges against Seale that we have found legally sufficient shall be tried together.

■ The entire trial transcript up to the declaration of a mistrial was made part of the contempt proceeding and shall be admitted against Seale, on the remand, in accordance with Mayberry v. Pennsylvania, 400 U.S. 455, 466, 91 S.Ct. 499, 27 L.Ed.2d 532. The Government's case should commence with the introduction of the trial transcript [49] and may be aug-

mented by witnesses, subject to cross-examination by Seale, and by statements that meet the exceptions to the hearsay rule and are not violative of the Sixth Amendment right of confrontation.

We accept the following standards suggested by the Government as an accurate statement of the requisites of due process:

"Defendants have a due process right to defend against the contempt charges and offer a mitigating explanation. Assistance of counsel and the right to a public hearing apply. The presumption of innocence, as in other criminal cases, attaches and all elements of the offense must be proved beyond a reasonable doubt." [50]

In addition, the right to compulsory process must be afforded, and Seale may submit evidence, testimonial or documentary, that is relevant "either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed." Cooke v. United States, 267 U.S. 517, 537, 45 S.Ct. 390, 395, 69 L.Ed. 767; Offutt v. United States, 232 F.2d 69, 71 (D.C. Cir.), certiorari denied, 351 U.S. 988, 76 S.Ct. 1049, 100 L.Ed. 786 (1956). However, in the exercise of sound discretion, the hearing judge may decide that it is unnecessary that either the trial judge or prosecutors be called as witnesses. Offutt v. United States, *supra* at 72. This would avoid tension and injection of personalities. The second judge may be able to get along without them because usually both the facts of the contempts and any judicial improprieties, to the extent material in mitigation, will

---

48. Of course, neither the fact that due process required the trial judge to disqualify himself from presiding over the post-trial contempt proceedings nor the fact that the Sixth Amendment required a jury trial in these circumstances diminished the trial judge's authority to charge Seale with individual specifications of contempt. See State v. Browder, 486 P.2d 925, 939 (Sup.Ct. of Alaska 1971); Note, Criminal Law—Contempt—Conduct of Attorney During Course of Trial, 1971 Wis.L.Rev. 329, 353.

49. In our view Mayberry v. Pennsylvania, 400 U.S. 455, 466, 91 S.Ct. 499, 27 L. Ed.2d 532, dispels any contention that the introduction of the trial transcript would violate the confrontation rights of a contempt defendant.

50. Government's brief in In the Matter of David Dellinger et al., No. 18294, p. 257; footnotes omitted. See United States v. Meyer, 149 U.S.App.D.C. ——, 462 F.2d 827 (1972).

be adequately established by the record. Where the record is inadequate, live witnesses such as other court officers and bystanders could be called to testify.

 The next presiding judge is in no way bound by the sentences originally imposed. As already indicated, it would be within his discretion to determine that the outside limit for the aggregate sentence would be six months, and obviate the necessity of having a jury. Seale need not be given credit for the claimed year and a half served, since his only federal time served, when not in confinement in connection with California or Connecticut charges, was from May 25, 1971, until May 28, 1971.[51] Only that limited time need be credited toward any sentence imposed upon remand.

The foregoing guidelines are established under our supervisory power in an attempt to achieve judicial economy. We must and do rely on the good sense of the substitute trial judge to implement them upon the remand.

---

Since whe have held that it was improper for Seale to have been summarily punished under Rule 42(a) of the Federal Rules of Criminal Procedure, we need not decide whether the proceeding below was defective as to notice or hearing. We have considered all arguments presented by the parties and *amici curiae* in reaching our conclusion that this cause must be remanded for jury trial before a different judge.

Reversed and remanded for further proceedings not inconsistent herewith.

## APPENDIX

---

United States District Court
Northern District Of Illinois
Eastern Division

United States of America ex rel.
Judge Julius J. Hoffman

v.

Bobby G. Seale

No. 69 CR 180

---

## CERTIFICATE OF CONTEMPT

In conformity with Rule 42(a) of the Federal Rules of Criminal Procedure and Title 18, United States Code, Section 401 I hereby certify that I saw and heard the conduct set forth below, which conduct took place in the actual presence of the Court during the trial of the case entitled United States of America v. David Dellinger, et al., 69 CR 180 which commenced on September 24, 1969, and has continued to the date of this order.

51. Pursuant to a writ of habeas corpus ad prosequendum, Seale was brought to Chicago for trial from California, where he was incarcerated on state charges. After the declaration of his mistrial on November 5, 1970, he was returned to the San Francisco County Jail on November 10, 1969. On January 28, 1970, he was again brought to Chicago under a writ of habeas corpus ad testificandum to testify for the defense and returned to California the following day. California authorities released Seale to Connecticut to face charges there. Facing charges for conspiracy to commit murder, Seale was not admitted to bail in Connecticut. Upon the dismissal of Connecticut charges, Seale was taken into federal custody on May 25, 1971. Three days later on May 28, 1971, he was released from federal custody on a $25,000 bond.

"Absent clear intent to have defendant's sentence run concurrently with any state sentence, the execution of his federal sentence did not begin to run until the United States Marshal assumed custody over him at his place of detention to await transportation to the federal penitentiary." United States v. Kanton, 362 F.2d 178, 179–180 (7th Cir. 1966), cer-

I find that the acts, statements and conduct of the defendant Seale hereinafter specified, each constitute a separate contempt of this Court; that each constituted a deliberate and wilful attack upon the administration of justice in an attempt to sabotage the functioning of the Federal judicial system; that this misconduct was of so grave a character as to continually disrupt the orderly administration of justice. To maintain the dignity of the Court and to preserve order in the courtroom under these circumstances has been a task of utmost difficulty. There were accordingly repeated warnings to the defendant Seale to cease this conduct and that it would be dealt with accordingly at an appropriate time. However, his continued disruptive conduct made it necessary for this Court for the first time within the experience of this Court to physically and forcibly restrain him. These measures, however, proved insufficient. Because of the potential effect that the continuation of these activities might have had in the future on the administration of justice in this case, it is necessary that I deal with this conduct at this time. As isolated questions from or references to the transcript can give but a partial view of the act, statements and conduct referred to, I hereby make the entire record part of these proceedings.

The Court also notes that a reading of this record can not and does not reflect the true intensity and extent of the disruptions which, in some instances, were accompanied by physical violence which occurred in the presence of the Court.

Accordingly, I adjudge the defendant Bobby G. Seale guilty of the several criminal contempts described below. In citing these specific acts and statements of the defendant Seale as contemptuous, the Court has selected only the most flagrant.

## I.

On Friday, September 26, 1969, during the morning session prior to the time opening statements were made, the defendant Seale addressed the Court in the following manner (Tr. 3):

"If I am consistently denied this right of legal defense counsel of my choice who is effective by the judge of this court, then I can only see the judge as a blatant racist of the United States Court—

The Court: Just a minute. Just a minute.

Mr. Seale: —with gross prejudicial error toward all defendants and myself—

The Court: Just a minute. What did you say?

Read that, Miss Reporter.

Mr. Seale: I said if my constitutional rights are denied as my constitutional rights have been denied in the past in the course of the trial, et cetera, then the tenor is the act of racism, and me, a black man, there seems to be a form of prejudice against me, even to the other defendants, on the part of the judge."

tiorari denied, 386 U.S. 986, 87 S.Ct. 1298, 18 L.Ed.2d 239. No clear intent to have the federal sentence begin immediately upon imposition and run while Seale was incarcerated on state charges is manifest here. Therefore, his federal sentence did not commence until he was released by Connecticut to federal authorities on May 25, 1971. Blackshear v. United States, 434 F.2d 58, 59 (5th Cir. 1970) ; Burge v. United States, 332 F. 2d 171, 175 (8th Cir.), certiorari denied, 379 U.S. 883, 85 S.Ct. 155, 13 L.Ed. 2d 89 (1964) ; United States v. Raymond, 218 F.2d 952, 953 (2d Cir. 1955). The fact that Connecticut released Seale to federal authorities upon the dismissal of state charges rather than upon the conclusion of a criminal sentence has no legal bearing on the date of commencement of the federal sentence. Of course, in exercising his discretion as to any sentence which may finally be imposed in this case, the district judge may take cognizance of time the defendant spent in state custody in connection with charges subsequently dismissed, as the Government concedes. Finally, no opinion by a Government attorney that the federal sentence began to run when imposed could nullify the legal rule in the circumstances present here.

## II.

During the morning session on October 14, 1969, while the Court, Mr. Schultz and Mr. Weinglass were engaged in a colloquy, the defendant Seale interrupted Mr. Weinglass and the following occurred (Tr. 2206):

"Mr. Seale: Hey, you don't speak for me. I would like to speak on behalf of my own self and have my counsel handle my case in behalf of myself.

How come I can't speak in behalf of myself? I am my own legal counsel. I don't want these lawyers to represent me.

The Court: You have a lawyer of record and he has been of record here since the 24th.

Mr. Seale: I have been arguing that before that jury heard one shred of evidence. I don't want these lawyers because I can take up my own legal defense and my lawyer is Charles Garry.

The Court: I direct you, sir, to remain quiet.

Mr. Seale: And just be railroaded?

The Court: Will you remain quiet?

Mr. Seale: I want to defend myself, do you mind, please?

The Court: Let the record show that the defendant Seale continued to speak after the court courteously requested him to remain quiet."

## III.

During the morning session on October 16, 1969, out of the presence of the jury, while the witness Oklepek was testifying, a colloquy began between the Court, a marshal and Mr. Kunstler.

After a marshal explained that three spectators who were asked to leave the court had been allowed to return, the defendant Seale stated to the Court: "I think there is a bit of racism involved myself." (Tr. 2700).

## IV.

During the afternoon session on October 20, 1969, out of the presence of the jury, the defendant Seale presented and extensively argued a motion to be permitted to defend himself (Tr. 3121–3145). At the conclusion of the argument the jury returned to the courtroom and the following occurred (Tr. 3145):

"The Court: Is there any cross examination of this witness?

Mr. Seale: I would like to say, Judge, that you denied my motion to defend myself and you know this jury is prejudiced against me.

The Court: I will ask you to sit down.

Mr. Seale: You know that; the jury can't go home to their loved ones and their homes, and you know they have been made prejudiced against me.

The Court: Ladies and gentlemen of the jury, you are excused."

The jury was then excused and the following occurred (Tr. 3145–3149):

"Mr. Seale: They have been made prejudiced against me, I know. I should be allowed to defend myself. I should be allowed to speak so I can defend myself.

The Marshal: Be quiet.

Mr. Seale: Don't tell me to shut up. I got a right to speak. I need to speak to defend myself.

The Court: Mr. Seale: I must admonish you that any outburst such as you have just indulged in will be appropriately dealt with at the right time during this trial and I must order you not to do it again.

Mr. Seale: In other words, Judge—

The Court: If you do, you do it at your own risk, sir.

Mr. Seale: In other words, you are saying you are going to put me in contempt of court for speaking on behalf of myself?

The Court: I will not argue with you.

Mr. Marshal—

Mr. Seale: Is that what you are saying to me? I mean, I want to be clear.

The Court: Will you be quiet? That is all. You have lawyers to speak for you.

Mr. Seale: They don't speak for me. I want to represent myself. Charles R. Garry is not here in my service. I have explained to you in the past what the situation was. I was put in jail and everything else. Now you are saying you are going to put me in jail, you are going to put me in jail, that's one thing. You are going to put me in contempt of court because I am speaking in behalf of myself.

The Court: I didn't put you there, sir.

Mr. Seale: Because I am speaking in behalf of myself, to have a right to defend myself.

The Court: Yes sir.

Mr. Schultz: If the Court please, there is one thing that has not been stated—

Mr. Seale: The jury is prejudiced against me all right and you know it because of those threatening letters. You know it, those so-called jive threatening letters, and you know it's a lie. Now how can that jury give me a fair trial?

The Court: Mr. Marshal, will you go to that man and ask him to be quiet?

Mr. Seale: I will speak for myself. They can speak on behalf of myself. I still want to defend myself, and I know I have a right. I just want to let him know. That racist, that fascist. You know, the black man tries to get a fair trial in this country. The United States Government, huh. Nixon and the rest of them.

Go ahead and continue. I'll watch and get railroaded.

Mr. Schultz: If the Court please, there is one thing that has not been placed on the record, the fact that since the trial began—in fact, I think since September 24th, so far as I know—and I think this is a hundred per cent accurate—whenever the defendants have wanted to meet with Mr. Seale and the lawyers, the marshals have made arrangements to bring them to a room where all of them could get together, where Mr. Seale and the defendants and the lawyers have all met and consulted at every occasion that they have so requested. It has been done on a regular basis since the trial did begin.

I just thought that should be on the record and if there is any statement by defense counsel to the contrary, since I am not at the meetings and I don't know how many times they have asked the marshals to meet, I think they should so state now.

Mr. Seale: I would like to put something on the record. You weren't in that room unless you got a tape recorder in there and—

The Marshal: I am asking you to keep quiet.

Mr. Seale: That man is lying on me.

The Marshal: All right.

Mr. Seale: I met with these defendants and argued with these so-called cats about so-called defending me. I want that for the record, too."

V.

During the morning session on October 22, 1969, while argument on a motion of William Kunstler for leave to withdraw as counsel for defendant Seale, the following occurred in open court (Tr. 3534–3536):

"Mr. Seale: Can I speak on that and answer his argument?

The Court: No. This is not your motion, sir. Your motion has been decided.

Mr. Seale: In other words, I can't speak in behalf of myself?

The Court: Not at this time, sir.

Mr. Seale: Why not?

The Court: Because this is your lawyer's motion.

Mr. Seale: That ain't my lawyer.

The Court: This is not your motion. This is the motion of Mr. William Kunstler for leave to withdraw as your lawyer.

Mr. Seale: Well, this man has misconstrued a whole lot of things concerning my right to defend myself and he knows he did.

They can jack you up and get you to sit up there and say rotten, crazy stuff concerning my right to defend myself.

The Court: I would request the marshal to ask the young man to sit down.

Mr. Seale: Well, I want my right to defend myself and this man knew, I indicated to him he was not my counsel at the very beginning when I first got here and arrived here and was in jail.

The Court: That motion—since you will not listen to the Court, you may sit down.

Have him sit down, Mr. Marshal.

Mr. Seale: I still want my right to defend myself. A railroad operation, and you know it, from Nixon on down. They got you running around here violating my constitutional rights."

## VI.

During the morning session on October 22, 1969, in the presence of the jury after the witness Carcerano had been excused, the Government attempted to offer Government's Exhibit 14 into evidence and the following occurred (T. R. 3599–3601):

"Mr. Schultz: That's the number, your Honor. We would like to offer it at this time so that before the next witness takes the stand—

The Court: Show it to counsel.

Mr. Seale: That's not a black power sign. Somebody correct the Court on that. It's not the black power sign. It's the power to the people sign.

The Court: Mr. Marshal, will you stop the talking, please.

Mr. Seale: Yes, but that is still wrong, Judge Hoffman. It's not a black power sign. It's a power to the people sign, and he is deliberately distorting that, and that's a racist technique.

Mr. Schultz: If the Court please, this man has repeatedly called me a racist—

Mr. Seale: Yes, you are. You are, Dick Schultz.

Mr. Schultz: And called Mr. Foran a racist—

The Court: Ladies and gentlemen of the jury, I will ask you to leave the court. Mr. Marshal, remove the ladies and gentlemen of the jury."

The jury was then asked to leave the courtroom and the following occurred:

"The Court: Mr. Seale and Mr. Kunstler, your lawyer, I must admonish you that such outbursts are considered by the court to be contemptuous, contumacious, and will be dealt with appropriately in the future.

Mr. Kunstler: Your Honor, the defendant was trying to defend himself, and I have already indicated my—

The Court: The defendant was not defending himself.

Mr. Seale: I was too, defending myself. Any time anybody gives me the wrong symbol in this courtroom is deliberately—

The Court: He is not addressing me with authority—

Mr. Seale: —distorting, and put it on the record.

The Court: Instruct that man to keep quiet.

Mr. Seale: I want to defend myself and ask him if he isn't lying, and he is going to put that lying crap on the record? No siree—I am not going to sit here and get that on the record. I am going to at least get it be known—request that you understand that this man is erroneously representing symbols related to the party of which I am chairman."

## VII.

During the afternoon session on October 22, 1969, the Court informed the defendant Seale that the Court would supervise the decorum of the courtroom and the following occurred in open court (Tr. 3641–3642):

"Mr. Seale: They don't take orders from racist judges, but I can convey the orders for them and they will follow them.

The Court: If you continue with that sort of thing, you may expect to be punished for it. I warned you right through this trial and I warn you again, sir.

Bring in the jury.

Mr. Seale: We protested our rights for four hundred years and we have been shot and killed and murdered and brutalized and oppressed for four hundred years because of—

The Court: There is another instance, that outburst may appear of record and it does.

Did you get it, Miss Reporter?

The Reporter: Yes, sir.

Mr. Seale: I hope you got my part for the record, too, concerning that. Did you get that, ma'am?

The Reporter: Yes, sir.

Mr. Seale: Thank you.

The Court: And that outburst also.

Mr. Dellinger: I think you should under stand we support Bobby Seale in this —at least I do.

The Court: I haven't asked you for any advice here, sir.

Mr. Seale: If you let me defend myself, you could instruct me on the proceedings that I can act, but I have to just—

The Court: You will have to be quiet.

Mr. Seale: All I have to do is clear the record. I want to defend myself in behalf of my constitutional rights.

The Court: Let the record show that the defendant Seale has refused to be quiet in the face of the admonition and direction of the court.

Mr. Seale: Let the record show that Bobby Seale speaks out in behalf of his constitutional rights, his right to defend himself, his right to speak in behalf of himself in this courtroom.

The Court: Again let the record show that he has disobeyed the order of the court.

Bring in the jury, Mr. Marshal.

Mr. Seale: Please do."

## VIII.

At the opening of the morning session on October 27, 1969, the following occurred in open court (Tr. 4217–4222):

"The Court: Ladies and gentlemen of the jury, good morning.

Mr. Seale: Good morning, ladies and gentlemen of the jury.

As I said before, I hope you don't blame me for anything.

The Court: Mr. Marshal, will you tell that man to sit down.

The Marshal: Take a seat, Mr. Seale.

Mr. Seale: I know—

The Court: Mr. Marshal, I think Mr. Seale is saying something there.

Mr. Seale: I know I am saying something. You know I am getting ready to speak out in behalf of my constitutional rights again, don't you?

The Court: I will ask you to sit down, sir.

The Marshal: Sit down.

Mr. Seale: You also know I am speaking out for the right to defend myself again, don't you, because I have that right as a defendant, don't I?

The Court: I will have to ask you to sit down, sir.

Mr. Seale: You know what I am going to say, don't you?

The Court: No, I don't.

Mr. Seale: Well, I said it before.

The Court: I don't know what you are going to say and you have a very competent lawyer of record here.

Mr. Seale: He is not my lawyer and you know I fired him before that jury was even picked and put together.

The Court: Will you ask him to sit down, Mr. Marshal?

The Marshal: Sit down, Mr. Seale.

Mr. Seale: What about my constitutional right to defend myself and have my lawyer?

The Court: Your constitutional rights

—

Mr. Seale: You are denying them. You have been denying them. Every other word you say is denied, denied, denied, denied, and you begin to oink in the faces of the masses of the people of this country. That is what you begin to represent, the corruptness of this rotten government of four hundred years.

The Marshal: Mr. Seale, will you sit down.

Mr. Seale: Why don't you knock me in the mouth? Try that.

The Marshal: Sit down.

The Court: Ladies and gentlemen of the jury, I regret that I will have to excuse you.

Mr. Seale: I hope you don't blame me for anything and those false lying notes and letters that were sent that said the Black Panther Party threatened that jury, it's a lie, and you know it's a lie, and the government did it to taint the jury against me.

(The following proceedings were had in open court, out of the presence and hearing of the jury:)

Mr. Seale: You got that? This racist administrative government with its super man notions and comic book politics. We're hip to the fact that Super Man never saved no black people. You got that?

Mr. Kunstler: I might say, your Honor, you know that I have tried to withdraw from this and you know that Mr. Seale—

The Court: I don't know what you tried to do. I know your appearance is of record, and I know I have your assurance orally of record that you represent this man.

Mr. Kunstler: You have a withdrawal of that assurance, your Honor. You knew that on September 30th, you knew that Mr. Seale had discharged me.

The Court: You represent him and the record shows it.

Mr. Kunstler: Your Honor, you can't go on those semantics. This man wants to defend himself.

The Court: This isn't semantics. I am not fooled by all of this business.

Mr. Seale: I still demand the right to defend myself. You are not fooled? After you have walked over people's constitutional rights?

The Marshal: Sit down, Mr. Seale.

Mr. Seale: After you done walked over people's constitutional rights, after you done walked over people's constitutional rights, the Sixth Amendment, the Fifth Amendment, and the phoniness and the corruptness of this very trial, for people to have a right to speak out, freedom of speech, freedom of assembly, and et cetera. You have did everything you could with those jive lying witnesses up there presented by these pig agents of the Government to lie and say and condone some rotten racists, facist crap by racist cops and pigs that beat people's heads—and I demand my constitutional rights—demand—demand—

Call in the jury.

The Court: Will the Marshal bring in the jury, please."

IX.

During the direct examination of the witness, William Frapolly on October 27, 1969, the following occurred (Tr. 4342–4346):

"Mr. Seale: I object to that because my lawyer is not here, I have been denied my right to defend myself in this courtroom. I object to this man's testimony against me because I have not been allowed my constitutional rights.

The Court: I repeat to you, sir, you have a lawyer. Your lawyer is Mr. Kunstler, who represented to the Court that he represents you.

Mr. Seale: He does not represent me.

The Court: And he has filed an appearance.

Ladies and gentlemen, I will excuse you.

(The following proceedings were had in open court, outside the presence and hearing of the jury:)

Mr. Kunstler: May I say I have withdrawn or attempted to withdraw.

Mr. Seale: The defense filed a motion before the jury ever heard any evidence, and I object to that testimony.

The Court: For your information, sir, I do not hear parties to a case who are represented by lawyers. You are represented by a lawyer.

Mr. Seale: I am not represented by a lawyer. I am not represented by Charles Garry for your information.

The Marshal: Sit down, Mr. Seale.

The Court: Now you just keep on this way and—

Mr. Seale: Keep on what? Keep on what?

The Court: Just sit down.

Mr. Seale: Keep on what? Keep on getting denied my constitutional rights?

The Court: Will you be quiet?

Mr. Seale: I object to that man's— can't I object to that man there sitting up there testifying against me and my constitutional rights denied to my lawyer being here?

Now I still object. I object because you know it is wrong. You denied me my right to defend myself. You think black people don't have a mind. Well, we got big minds, good minds, and we know how to come forth with constitutional rights, the so-called constitutional rights. I am not going to be quiet. I am talking in behalf of my constitutional rights, man, in behalf of myself, that's my constitutional right to talk in behalf of my constitutional rights.

The Court: Bring in the jury, Mr. Marshal.

Mr. Seale: I still object to that man testifying against me without my lawyer being here, without me having a right to defend myself.

Black people ain't supposed to have a mind? That's what you think. We got a body and a mind. I wonder, did you lose yours in the Superman syndrome comic book stories? You must have to deny us our constitutional rights.

The Court: Are you getting all of this, Miss Reporter?

Mr. Seale: I hope she gets it all.

(The following proceedings were had in open court, within the presence and hearing of the jury:)

Mr. Seale: Tain't the jury against me, send them threatening letters that I never sent, that I never sent, and you know it's a lie, you keep them away from their homes and they blame me every time they come in this room because they are being kept away from their homes, and you did it.

The Court: Are you going to stop, sir?

Mr. Seale: I am going to talk in behalf of my constitutional rights.

The Court: You may continue, sir, with the direct examination of this witness.

And I note that your counsel has remained quiet during your dissertation.

Mr. Seale: You know what? I have no counsel here. I fired that lawyer before that jury heard anything and you know it. That jury hasn't heard all of the motions you denied behind the scenes. How you tricked that juror out of that stand there by threatening her with that jive letter that you know darned well I didn't send, which is a lie. And they blame me every time they are being kept from their loved ones and their homes. They blame me every time they come in the room. And I never sent those letters, you know it.

The Court: Please continue with the direct examination."

X.

On October 28, 1969, during the afternoon session, while the witness William Frapolly was testifying on cross examination, the following occurred in open court (Tr. 4607 et seq.):

"The Court: Mr. Weinglass, do you want to cross examine this witness?

Mr. Seale: I would like to request to cross examine the witness.

The Court: You have a lawyer here.

Mr. Seale: That man is not my lawyer. The man made statements against me. Furthermore you violated Title 1982 of the United States—well, you are still violating it.

The Marshal: Sit down, Mr. Seale.

Mr. Seale: You violated the Code. You violated the United States Laws against my rights.

The Court: Mr. Marshal, will you ask Mr. Seale to sit down in his chair?

Mr. Seale: You are violating Title 42, United States Criminal Code. You are violating it because it states that a black man cannot be discriminated against in his legal defense.

The Court: Will you sit down?

Mr. Seale: It is an old Reconstruction law and you won't recognize it, so I would like to cross examine the witness.

The Court: Will you sit down, sir?

Mr. Seale: I still want to cross examine the witness.

The Court: You may not.

A Marshal: May I remove the jury please?

The Court: Ladies and gentlemen of the jury, you may be excused."

After the jury was excused, the defendant Seale continued to refuse to obey the order of the Court to remain silent. Thereupon the following occurred in open Court (Tr. 4611 et seq.):

"The Court: Let the record show that the defendant—

Mr. Seale: Let the record show you violated that and a black man cannot be discriminated against in relation to his legal defense and that is exactly what you have done. You know you have. Let the record show that.

The Court: The record shows exactly to the contrary.

Mr. Seale: The record shows that you are violating, that you violated my constitutional rights. I want to cross examine the witness. I want to cross examine the witness.

The Court: Bring in the jury, Mr. Marshal, and we will let them go for this evening.

I admonish you, sir, that you have a lot of contemptuous conduct against you.

Mr. Seale: Admonish you. You are in contempt of people's constitutional rights. You are in contempt of the constitutional rights of the mass of the people of the United States. You are the one in contempt of people's constitutional rights. I am not in contempt of nothing. You are the one who is in contempt. The people of America need to admonish you and the whole Nixon administration.

Let me cross examine the witness. You won't even let me read—you wouldn't even let me read my statement this morning, my motion this morning, concerning the fact that I wanted a copy of the transcript for my own legal defense.

The Court: Bring in the jury.

Is he getting the jury?

The Clerk: Yes, your Honor.

The Court: Tell him to just bring them before the box.

Mr. Seale: I want to cross examine the witness.

Mr. Hayden: Let the record show the Judge was laughing.

Mr. Seale: Yes, he is laughing.

The Court: Who made that remark?

Mr. Foran: The defendant Hayden, your Honor, made the remark.

Mr. Seale: And me.

The Court: Let the record show that—

Mr. Seale: I still want to cross examine the witness to defend myself."

The Jury was then returned to the courtroom to be excused for the day during which time the defendant Seale continued to speak. Thereafter, the following occurred in open court (Tr. 4615 et seq.):

"The Court: You may sit down.

I must admonish the defendant and his counsel—

Mr. Seale: Counsel ain't got nothing to do with it. I'm my own counsel.

The Court: You are not doing very well for yourself.

Mr. Seale: Yes, that's because you violated my constitutional rights, Judge Hoffman. That's because you violated them overtly, deliberately, in a very racist manner. Somebody ought to point out the law to you. You don't want to investigate it to see whether the people get their constitutional rights. Sixty-eight thousand black men died in the

Civil War for that right. The right was made during the Reconstruction period. They fought in that war and 68,000 of them died. That law was made for me to have my constitutional rights.

The Court: Do you want to listen to me for a moment?

Mr. Seale: Why should I continue listening to you unless you are going to give me my constitutional rights. Let me defend myself.

The Court: I am warning you, sir, that the law—

Mr. Seale: Instead of warning, why don't you warn me I have got a right to defend myself, huh?

The Court: I am warning you that the court has the right to gag you. I don't want to do that. Under the law you may be gagged and chained to your chair.

Mr. Seale: Gagged? I am being railroaded already. I am being railroaded already.

The Court: The Court has that right and I—

Mr. Seale: The Court has no right whatsoever. The Court has no right to stop me from speaking out in behalf of my constitutional rights because it is denying me the constitutional rights to seek [sic] out in behalf of myself and my legal defense.

The Court: The Court will be in recess until tomorrow morning at ten o'clock.

The Marshal: Everyone will please rise.

Mr. Seale: I am not rising. I am not rising until he recognizes my constitutional rights. Why should I rise for him? He is not recognizing—

The Court: Mr. Marshal—

Mr. Seale: I am not rising."

## XI.

On October 29, 1969, during the morning session, the following occurred in open court (Tr. 4632 et seq.):

"Mr. Schultz: If the Court please, before you came into this courtroom, if the Court please, Bobby Seale stood up and addressed this group.

Mr. Seale: That's right, brother.

Mr. Schultz: And Bobby Seale said if he is—

Mr. Seale: I spoke on behalf of my constitutional rights. I have a right to speak on behalf of my constitutional rights. That's right.

Mr. Schultz: And he told those people in the audience, if the Court please—and I want this on the record. It happened this morning—that if he's attacked, they know what to do.

Mr. Seale: I can speak on behalf of my constitutional rights, too.

Mr. Schultz: He was talking to these people about an attack by them.

Mr. Seale: You're lying. Dirty liar. I told them to defend themselves. You are a rotten racist pig, fascist liar, that's what you are. You're a rotten liar. You're a rotten liar. You are a fascist pig liar.

I said they had a right to defend themselves if they are attacked, and I hope that the record carries that, and I hope the record shows that tricky Dick Schultz, working for Richard Nixon and administration all understand that tricky Dick Schultz is a liar, and we have a right to defend ourselves, and if you attack me I will defend myself.

Spectators: Right on.

Mr. Schultz: If the Court please, that is what he said, just as he related it.

Mr. Seale: You're darned right.

Mr. Schultz: In terms of a physical attack by the people in this—

Mr. Seale: A physical attack by those damned marshals, that's what I said.

The Court: Let—

Mr. Seale: And if they attack my people, they have a right to defend themselves, you lying pig.

The Court: Let the record show the tone of Mr. Seale's voice was one shrieking and pounding on the table and shouting. That will be dealt with appropriately at some time in the future."

The defendant Seale then continued to speak after the jury entered the courtroom and the Court then excused them. After the jury left, the defendant Seale made the following comment to the Court (Tr. 4641):

"Mr. Seale: If a witness is on the stand and testifies against me and I stand up and speak out in behalf of my right to have my lawyer and to defend myself and you deny me that, I have a right to make those requests. I have a right to make those demands on my constitutional rights. I have a constitutional right to speak, and if you try to suppress my constitutional right to speak out in behalf of my constitutional rights, then I can only see you as a bigot, a racist, and a fascist, as I have said before and clearly indicated on the record."

### XII.

On October 29, 1969, during the morning session when the cross examination of the witness Frapolly was completed, the following occurred in open court (Tr. 4719 et seq.):

"The Court: Is there any redirect examination?

Mr. Seale: Before the redirect, I would like to request again—demand—that I be able to cross examine the witness. My lawyer is not here. I think I have a right to defend myself in this courtroom.

The Court: Take the jury out, and they may go to lunch with the usual order.

. Mr. Seale: You have George Washington and Benjamin Franklin sitting in a picture behind you, and they was slave owners. That's what they were. They owned slaves. You are acting in the same manner, denying me my constitutional rights being able to cross examine this witness.

(The following proceedings were had in open court, out of the presence and hearing of the jury:)

Mr. Seale: You have had direct examination, we have cross examination by the other defendants' lawyers, and I have a right to cross examine the witness.

The Court: Mr. Seale, I have admonished you previously—

Mr. Seale: I have a right to cross examine the witness.

The Court: —what might happen to you if you keep on talking.

Mr. Seale: I still have the right to cross examine the witness.

Why don't you recognize my constitutional rights.

The Court: Mr. Kunstler has his appearance on record here as your attorney.

Mr. Seale: He is not. He is not. He is not my lawyer, and you know that.

The Court: He is. I don't know—

Mr. Seale: You know that.

The Court: I know that he is, and I know this is just an entire device here—

Mr. Seale: He is not my lawyer. You have forced—you have made your choice of who you think should represent me. That is not true. I make the choice of Charles R. Garry to represent me.

The Court: We are going to recess now, young man. If you keep this up—

Mr. Seale: Look, old man, if you keep up denying me my constitutional rights, you are being exposed to the public and the world that you do not care about people's constitutional rights to defend themselves.

The Court: I will tell you that what I indicated yesterday might happen to you —

Mr. Seale: Happen to me? What can happen to me more than what Benjamin Franklin and George Washington did to black people in slavery? What can happen to me more than that?

The Court: And I might add since it has been said here that all of the defendants support you in your position that I might conclude that they are bad risks for bail, and I say that to you, Mr. Kunstler, that if you can't control your client—

Mr. Seale: I still demand my constitutional rights as a defendant in this case

to defend myself. I demand the right to be able to cross-examine this witness. He has made statements against me and I want my right to—

The Court: Have him sit down, Mr. Marshal.

Mr. Seale: I want my constitutional rights. I want to have my constitutional rights. How come you won't recognize it? How come you won't recognize my constitutional rights? I want to have the right to cross-examine that witness.

Mr. Schultz: May the record show, if the Court please, that the defendant Dellinger—

Mr. Seale: I want my right to cross-examine the witness, my right to defend myself in this courtroom. I do not have a lawyer in this courtroom.

The Court: I will hear from you, Mr. Schultz.

Mr. Schultz: May the record show, if the Court please, that while the marshals were seating Bobby Seale, pushing him in the chair, the defendant Dellinger physically attempted to interfere with the marshals by pushing them out of the way.

Mr. Seale: I want my rights. I want my rights to defend myself. I want my right to defend myself in this trial: I want my rights recognized.

The Court: Mr. Kunstler, I will address you if you will stand up.

Mr. Kunstler: I was going to address you, your Honor, because you had made some remarks—

Mr. Seale: He doesn't represent me. You can address him all you want. He doesn't represent me. He doesn't represent me. You can address him all you want.

They are the ones that's pushing me.

Mr. Kunstler: Your Honor, you made a threat about my—

The Court: I tell you that Mr. Dellinger—if that is his name—has said here that they support the performances of this man, the statements of this man.

Mr. Kunstler: They support his right to have a lawyer or to defend himself.

The Court: You told me you were his lawyer.

Mr. Kunstler: Your Honor—

Mr. Seale: He is not my lawyer.

The Court: I have the transcript right here.

Mr. Kunstler: Your Honor, we have gone over that.

Mr. Seale: I told you I fired him before the trial began.

The Court: You haven't explained—

Mr. Kunstler: I have explained it fully. I have been discharged—

The Court: No, you haven't, and you will.

Mr. Kunstler: I told you on the 27th and I told you on the 30th.

The Court: I tell you some day you will have to explain it.

Mr. Kunstler: That is another threat to the lawyers, your Honor. We have had so many that—

The Court: Now I will tell you this, that since it has been said here that all of the defendants support this man in what he is doing, I over the noon hour will reflect on whether they are good risks for bail and I shall give serious consideration to the termination of their bail if you can't control your clients, and you couldn't yesterday afternoon.

Mr. Seale: I am not—I am not a defendant—he is not my lawyer. I want my right to defend myself. I want my right to defend myself.

Mr. Kunstler: Your Honor, they said this morning they supported fully his right to defend himself or have his lawyer of choice, and if that is the price of their bail, then I guess that will have to be the price of their bail.

The Court: Let me tell you—

Mr. Seale: I have a right to defend myself. That's what you—

The Court: Will you, Mr. Marshal, have that man sit down.

Mr. Seale: You trying to make jive bargaining operations and that's different from the right I have.

I have a right to defend myself. I still have a right to defend myself whether you sit me down or not. I still got a right to defend myself. I got a right to speak on behalf of my defense. I have a right to speak out in behalf of my defense, and you know it. You know it. Why don't you recognize my right to defend myself?

Mr. Schultz: May the record show that the defendant Dellinger did the same thing just now?

The Court: I saw it myself.

Mr. Kunstler: Your Honor, he is trying to see what is happening.

Mr. Seale: I want the constitutional right to defend myself. I want the right to cross examine the witness, and why don't you recognize the law of this land and give me my constitutional right to defend myself?"

## XIII.

At the beginning of the afternoon sessin on October 29, 1969, the Court and Counsel engaged in a lengthy colloquy during which the following occurred (Tr. 4752):

"Mr. Kunstler: Your Honor, I would just like about two minutes to respond.

Mr. Seale: Since he made all of these statements, can I say something to the court?

The Court: No, thank you.

Mr. Seale: Why not?

The Court: Because you have a lawyer and I am not going to go through that again.

Mr. Seale: He is not my lawyer. How come I can't say nothing? He had distorted everything, and it relates to the fact I have a right to defend myself.

The Court: I ask you to sit down. If there has been any distortion by anybody, I am perfectly capable of understanding it.

Mr. Seale: I don't think you will. See? I don't think you will. Your past actions of denying me the constitutional right to defend myself—

The Court: Did you want to reply, Mr. Kunstler?

Mr. Seale: Yes, I did. I wanted to reply.

The Court: I was talking to Mr. Kunstler, if you don't mind."

The colloquy continued and the Court thereafter ordered the jury into the courtroom at which time the following occurred (Tr. 4762 et seq.):

"Mr. Kunstler: Then I have nothing further to say, your Honor.

The Court: Bring in the jury, please.

Mr. Seale: What about Section 1982, Title 42 of the Code where it says the black man cannot be discriminated against in my legal defense in any court in America?

The Court: Mr. Seale, you do know what is going to happen to you—

Mr. Seale: You just got through saying you observed the laws. That law protects my right not to be discriminated against in my legal defense. Why don't you recognize that? Let me defend myself. From the first time when I asked —when I attempted to make an opening statement, and you stopped me and denied me that right—

The Court: I will not hear you now. I am asking you to be silent.

Mr. Seale: I want to know will you— Oh, look—it's a form of racism, racism is what stopped my argument.

The Court: Hold the jury, Mr. Marshal.

Mr. Seale: My argument is and I still argue the point that you recognize my constitutional rights to defend myself.

The Court: Mr. Seale, do you want to stop or do you want me to direct the marshal—

Mr. Seale: I want to argue the point about this so you can get an understanding of the fact I have a right to defend myself.

The Court: We will take a recess.

Take that defendant into the room in there and deal with him as he should be dealt with in this circumstance.

Mr. Seale: I still want to be represented. I want to represent myself.

The Marshal: Mr. Kunstler, will you instruct the defendants, sir, that it is the order of the court that they will arise upon the recess?

Mr. Kunstler: If that is a direction of the court, I certainly will pass it on.

The Court: Let the record show none of the defendants have stood at this recess, in response to the Marshal's request.

The court will be in recess for a few minutes.

Mr. Seale: Let the record show that—

The Marshal: This court will take a brief recess.

Mr. Seale: Let the record show—"

In an attempt to maintain order in the courtroom, the Court thereupon ordered the defendant Seale removed from the courtroom at which time he was forcibly restrained by binding and gagging. The defendant Seale was then returned to the courtroom, but continued to shout through the gag. The Court then ordered the marshal to reinforce the gag. The gag was then reinforced and the defendant Seale was returned to the courtroom. Eventually the jury was allowed in the courtroom for the afternoon session.

### XIV.

On October 30, 1969, at the opening of the morning session, the Court ordered the Marshal to adjust the restraints on the defendant Seale after he had complained of discomfort. Thereupon the following occurred in open court (Tr. 4814 et seq.):

"The Court: If the marshal has concluded that he needs assistance, of course.

I will excuse you, ladies and gentlemen of the jury, with my usual orders.

(The following proceedings were had in open court, out of the presence and hearing of the jury:)

Mr. Kunstler: Your Honor, are we going to stop this medieval torture that is going on in this courtroom? I think this is a disgrace.

Mr. Rubin: This guy is putting his elbow in Bobby's mouth and it wasn't necessary at all.

Mr. Kunstler: This is no longer a court of order, your Honor; this is a medieval torture chamber. It is a disgrace. They are assaulting the other defendants also.

Mr. Rubin: Don't hit me in my balls, m - - - - - f - - - - - .*

Mr. Seale: This m - - - - - f - - - - -* is tight and it is stopping my blood.

Mr. Kunstler: Your Honor, this is an unholy disgrace to the law that is going on in this courtroom and I as an American lawyer feel a disgrace.

Mr. Foran: Created by Mr. Kunstler.

Mr. Kunstler: Created by nothing other than what you have done to this man.

Mr. Hoffman: You come down here and watch it Judge.

Mr. Foran: May the record show that the outbursts are the defendant Rubin.

Mr. Seale: You fascist dogs, you rotten, low-life son-of-a-bitch. I am glad I said it about Washington used to have slaves, the first President—

Mr. Dellinger: Somebody go protect him.

Mr. Foran: Your Honor, may the record show that that is Mr. Dellinger saying someone go to protect him and the other comment is by Mr. Rubin.

Mr. Rubin: And my statement, too.

The Court: Everything you say will be taken down.

Mr. Kunstler: Your Honor, we would like the names of the marshals. We are going to ask for a judicial investigation of the entire condition and the entire treatment of Bobby Seale.

The Court: You ask for anything that you want. When you begin to keep

---

* Judge Aldrich euphemistically referred to this expression as "a vulgar term for an incestuous son" in Keefe v. Geanakos, 418 F.2d 359, 361 (1st Cir. 1969).

your word around here that you gave the court perhaps things can be done.

Mr. Kunstler: If we are going to talk about words I am prepared to give you back your word about Mr. Ball yesterday and what he said you said to him. We have the transcript now.

The Court: Don't point at me, sir, in that manner.

Mr. Kunstler: If we are going to talk about words, I'd like to exchange some.

The Court: Don't point at me in that manner.

Mr. Kunstler: I just feel so utterly ashamed to be an American lawyer at this time.

The Court: You should be ashamed of your conduct in this case, sir."

Thereafter, because of the chaos in the courtroom the morning session of court was recessed.

## XV.

During the afternoon session on Thursday, October 30, 1969, the following occurred (Tr. 4930–4934):

"Mr. Seale: I would like to cross-examine the witness. I want to cross-examine the witness.

The Court: Ladies and gentlemen of the jury, I will have to excuse you.

Mr. Seale: My constitutional rights have been violated. The direct examination is over, cross examination is over, I want to cross-examine the witness.

The Court: Please be quiet, sir. I order you to be quiet.

Mr. Seale: I have a right to cross-examine the witness. I want to cross-examine the witness at this time. I object to you not allowing me to cross-examine the witness. You know I have a right to do so.

The Court: Ladies and gentlemen of the jury, you are excused until tomorrow morning at ten o'clock. I must order you not to talk with anybody about this case, or let anybody speak with you about it, do not read the newspapers or any other journals. Do not listen to radio or television or look at television. If anybody

attempts to communicate with you about this case in any manner, please get in touch with the United States Marshal who will in turn lay the matter before me.

You are excused until tomorrow morning at ten o'clock.

Mr. Witness, I direct you to return here tomorrow morning at ten o'clock.

Mr. Schultz: If the Court please, I think the examination of the witness was completed.

Mr. Weinglass: No.

Mr. Schultz: Oh, I am sorry. Mr. Weinglass was going to ask a question.

The Court: He had another question, he said.

I am sorry, I will have to direct you to return here tomorrow morning at ten o'clock.

I must order you not to talk with anybody about this case or let anybody speak with you about it until you resume the stand.

The Witness: Yes, sir.

The Court: Mr. Marshal, you may take the jury out.

(The following proceedings were had in open court, out of the presence and hearing of the jury:)

The Court: Now I want to tell you, Mr. Seale, again—I thought you were going to adhere to my directions. You sat there and did not during this afternoon intrude into the proceedings in an improper way.

Mr. Seale: I never intruded until it was the proper time for me to ask and request and demand that I have a right to defend myself and I have a right to cross-examine the witness: I sit through other cross examinations and after the cross examinations—

The Marshal: The Court will be in recess until tomorrow morning at ten o'clock."

## XVI.

On Wednesday, November 5, 1969, during the morning session, following the direct examination of the witness Ray,

the following took place [(Tr. 5404–5406)]:

"Mr. Seale: I would like to approach the lectern.

The Court: You may not cross examine, sir.

Mr. Seale: Well, I think I have a right to cross examine.

The Court: No, you have no right in the circumstances of this case.

Mr. Seale: Why did you follow me, could you please tell me, Mr. Witness—

The Court: Mr. Seale—

Mr. Seale: —at the airport?

The Court: Mr. Seale, I ask you to sit down.

Mr. Seale: Have you ever killed a Black Panther Party member?

The Court: Mr. Seale, I will have to ask you to sit down, please.

Mr. Seale: Have you ever been on any raids in the Black Panther Party's offices or Black Panther Party members' homes?

The Court: Mr. Seale, this is the third time. I am asking you to sit down, as courteously as possible.

Mr. Seale: Why don't you let me cross examine the witness and defend myself?

The Court: Because you are not entitled to. You have a lawyer of record who signed his appearance in his own handwriting.

Mr. Seale: This man was fired. He was not my lawyer before the jury heard one shred of evidence, before one witness even raised his hand to be sworn in the trial. The trial had not started until that happens.

The Court: You may not stand up—

Mr. Seale: This man is not my counsel.

The Court: Will you sit down, please.

Mr. Seale: He is not the representative of me. I am trying to defend myself. I'm being railroaded.

The Court: Will you sit down, sir.

Mr. Seale: Why can't you see that I have a right to try and cross examine witnesses, and I have a right to defend myself.

The Court: I am saying that you do not have the right at this juncture, sir.

Mr. Seale: Look there's 3500 material here that this here man is testifying against me. Somebody has to cross examine him.

The Court: But not you.

Mr. Seale: Me, myself, my own person have no right to defend myself? This is erroneous. It is a complete, complete overt, fascist attempt, fascist operation—

The Court: Ladies and gentlemen of the jury—

Mr. Seale: —of denying me my constitutional right.

The Court: Ladies and gentlemen of the jury, I ask you to leave the courtroom.

(Whereupon the following further proceedings were had herein, in open court, outside the presence and hearing of the jury:)

Mr. Seale: How about that? You are talking about insulting you. You are the one that is insulting me, insulting the people of the world, insulting the people of America, and you know it.

The Court: Gentlemen, we will recess until two o'clock."

Accordingly, it is therefore ordered that pursuant to the authority vested in this Court by Rule 42(a) of the Federal Rules of Criminal Procedure, and by Title 18, United States Code, Section 401, the defendant Bobby G. Seale be punished for the several contempts of this Court listed above. I find that the acts, statements and conduct of the defendant Bobby G. Seale, constituted a deliberate and wilful attack upon the administration of justice; an attempt to sabotage the functioning of the Federal Judiciary System, and misconduct of so grave a character as to make the mere imposition of a fine a futile gesture and a wholly insignificant punishment.

Therefore, it is further ordered that the defendant Seale be and he is hereby

ordered committed to the custody of the Attorney General of the United States or his authorized representative for imprisonment for a term of three (3) months on each and every of the sixteen (16) specifications, the sentences to follow each other; said sentences being consecutive.

Enter:

/s/ Julius J. Hoffman
United States District Judge

Dated at Chicago, Illinois,
this 5th day of November, 1969